# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

PRIME AID PHARMACY CORP.,

                Plaintiff,

        v.

HUMANA INC., HUMANA PHARMACY
SOLUTIONS, INC., HUMANA HEALTH
PLAN, INC. AND HUMANA INSURANCE
COMPANY,

                Defendants.

Case No. 2:16-cv-02104-SDW-SCM

Hon. Susan D. Wigenton, U.S.D.J.
Hon. Steven C. Mannion, U.S.M.J.

**Motion Return Date: October 17, 2016**

**Oral Argument Requested**

---

## DEFENDANTS HUMANA INC., HUMANA PHARMACY SOLUTIONS, INC., HUMANA HEALTH PLAN, INC., AND HUMANA INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

---

SQUIRE PATTON BOGGS (US) LLP
Mark C. Errico
Mark.Errico@squirepb.com
The Legal Center
One Riverfront Plaza
1037 Raymond Blvd.
Newark, New Jersey 07102
Telephone:    973-848-5600
Facsimile:    973-848-5601

Kimberly J. Donovan (admitted *pro hac vice*)
kimberly.donovan@squirepb.com
Rachael A. Harris (admitted *pro hac vice*)
rachael.harris@squirepb.com
Squire Patton Boggs (US) LLP
2550 M Street Northwest
Washington, D.C. 20037
T: 202-457-6000
F: 202-457-6315

Attorneys for Defendants
HUMANA INC., HUMANA PHARMACY
SOLUTIONS, INC., HUMANA HEALTH PLAN,
INC., and HUMANA INSURANCE COMPANY

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................ii

INTRODUCTION ............................................................................................... 1

BACKGROUND AND SUMMARY OF THE ALLEGATIONS ............................................... 3

    Party and Industry Background ........................................................................ 3

    Regulation of the Pharmacy Benefit Industry ....................................................... 3

    The Agreement ............................................................................................ 4

    Prime Aid Breached the Agreement .................................................................. 5

ARGUMENT .................................................................................................... 6

I.    Prime Aid's State Law Claims Are Deficient as a Matter of Law and Must Be Dismissed ............................................................................................. 7

    A.    New Jersey's Any Willing Provider Statutes Do Not Provide for a Private Right of Action, and in Any Event, Do Not Apply to PBMs. ............................. 7

        1.    There Is No Private Right of Action under the New Jersey Any Willing Provider Statutes. ........................................................... 7

        2.    The New Jersey AWP Statutes Do Not Apply to PBMs ......................... 11

    B.    Prime Aid's Claims Directed at Medicare Pharmacy Benefits Are Preempted. ......................................................................................... 12

    C.    Prime Aid Has Failed To Plausibly Allege That Defendants Violated the New Jersey Any Willing Provider Statutes ...................................................... 15

II.    Prime Aid's Antitrust Claims Should Be Dismissed as a Matter Of Law. ..................... 16

    A.    Defendants Have Not Engaged in Exclusionary Conduct. ................................. 18

    B.    Prime Aid Has Not Pled a Proper Relevant Market ........................................ 20

        1.    No Facts Support the Alleged Product Market. ..................................... 21

        2.    No Facts Support the Alleged Geographic Market. ................................ 24

    C.    Prime Aid Has Not Pled Facts to Show Monopoly Power in Any Relevant Market. ............................................................................................... 25

    D.    Prime Aid Has Not Pled Facts Supporting its Claim of Antitrust Injury ............ 27

    E.    Prime Aid Has Not Pled the Requisite Concerted Action for a Section One Claim. ................................................................................................ 29

CONCLUSION ................................................................................................ 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval,*
   532 U.S. 275 (2001)...........................................................................................7, 8

*Am. Millennium Ins. Co. v. First Keystone Risk Retention Group, Inc.,*
   332 Fed. Appx. 787 (3d Cir. 2009) ..............................................................9, 18, 21

*Arizona v. U.S.,*
   132 S. Ct. 2492 (2012)...........................................................................................13

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..................................................................................................6

*Assoc. of N.J. Chiropractors, Inc. v. Horizon Healthcare Svcs., Inc.,*
   No. A-6033-11T4, 2013 N.J. Super Unpub LEXIS 2677 (N.J. Suprt. Cy. App.
   Div. Nov. 4, 2013). ...................................................................................................9

*Avery Dennison Corp. v. Acco Brands, Inc.,*
   No. CV 99-1877 DT., 2000 U.S. Dist. LEXIS 3938 (C.D. Cal. Feb. 22, 2000) ....................25

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)......................................................................................6, 24, 29

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n,*
   No. 4:16-cv-00057, 2016 U.S. Dist. LEXIS 74571 (N.D. Okla. June 8, 2016) ....................27

*Brokerage Concepts v. United States Healthcare,*
    140 F.3d 494 (3d Cir. 1998)..........................................................................21, 22, 24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977)................................................................................................27

*Christy Sports, LLC v. Deer Valley Resort Co.,*
   555 F.3d 1188 (10th Cir. 2009) ....................................................................17, 19, 20, 23

*Chruby v. Kowaleski,*
   534 Fed. Appx. 156 (3d Cir. 2013)........................................................................11

*City of Pittsburgh v. West Penn Power Co.,*
   147 F.3d 256 (3d Cir. 1998)......................................................................................6

*Copperweld Corp. v. Indep. Tube Corp.,*
   467 U.S. 752 (1984)................................................................................................29

*Crossroad Cogeneration Corp. v. Orange & Rockland Utils., Inc.*,
    159 F.3d 129 (3d Cir. 1998)..................................................................................27

*Data Gen. Corp. v. Grumman Support Sys. Corp.*,
    36 F.3d 1147 (1st Cir. 1994)..................................................................................18

*Eastman Kodak Co. v. Image Technical Services*,
    504 U.S. 451 (1992)..............................................................................................26

*Eichorn v. AT&T Corp*,
    248 F.3d 131 (3d Cir. 2001)..................................................................................29

*Eisai Inc. v. Sanofi Aventis U.S. LLC*,
    No. 14-2017, 2016 U.S. App. LEXIS 8148 (3d Cir. 2016) ...........................16, 20

*Elliott v. United Ctr.*,
    126 F.3d 1003 (7th Cir. 1997) ..............................................................................21

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)..............................................................................................15

*Fineman v. Armstrong World Indus.*,
    980 F.2d 171 (3d Cir. N.J. 1992) ..........................................................................26

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ..............................................................................24

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992)................................................................................................14

*Glanville v. Dupar, Inc.*,
    727 F. Supp. 2d 596 (S.D. Tex. 2010) .................................................................11

*Gordon v. Lewistown Hosp.*,
    272 F. Supp. 2d 393 (M.D. Pa. 2003), *aff'd*, 423 F.3d 184 (2005).........................27

*Hack v. President & Fellows of Yale Coll.*,
    237 F.3d 81 (2d Cir. 2000)....................................................................................23

*Harrison Aire, Inc. v. Aerostar Int'l*,
    423 F.3d 374 (3d Cir. 2005)..................................................................................25

*HM Compounding Servs. v. Express Scripts, Inc.*,
    No. 4:14-CV-1858 JAR, 2015 U.S. Dist. LEXIS 89062 (E.D. Mo. July 9,
    2015) .........................................................................................................8, 10, 12

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l Inc.*,
    602 F.3d 237 (3d Cir. 2010)..................................................................................29

*Int'l Boxing Club of New York, Inc. v. U.S.*,
  358 U.S. 242 (1959)........................................................................................26

*J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*,
  365 F. Supp. 2d 119 (D. Mass. 2005) ...........................................................10

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
  302 F.3d 1207 (11th Cir. 2002) .....................................................................25

*McCullough v. Zimmer Inc.*,
  382 Fed. App'x 225 (3d Cir. 2010)................................................................29

*Med. Soc'y of N.J. v. AmeriHealth HMO, Inc.*,
  376 N.J. Super. 48 (N.J. App. Div. 2005).......................................................9

*Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.*,
  No. 12-3824, 2015 U.S. Dist. LEXIS 50026 (E.D. Pa. Apr. 16, 2015) ..................................26

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
  468 U.S. 85 (1984)..........................................................................................18

*In re: New Jersey Firemen's Ass'n Obligation to Provide Relief Applications
  under Open Public Records Act*,
  443 N.J. Super. 238 (N.J. App. Div. 2015).....................................................11

*Novak v. Somerset Hosp.*,
  No. 3:07cv304, 2014 U.S. Dist. LEXIS 138028 (W.D. Pa. Sept. 30, 2014) ..........................28

*Prime Aid Pharm Corp. v. Envision Pharm. Servs. LLC*,
  Case No. 2:16-cv-02105 (D.N.J. July 5, 2016)................................................6

*Prime Aid Pharm. Corp. v. Express Scripts, Inc.*,
  Case No. 2:16-cv-02182 (D.N.J. June 30, 2016)..............................................7

*Quality Infusion Care, Inc. v. Humana Health Plan of Tex., Inc.*,
  290 Fed. App'x. 671 (5th Cir. 2008) ..............................................................10

*Queen City Pizza v. Domino's Pizza*,
  124 F.3d 430 (3d Cir. 1997)................................................................20, 21, 22

*R.I. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*,
  773 A.2d 1132 (N.J. 2001)............................................................................8, 9

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010)..........................................................................16, 17

*In re Remeron Direct Purchaser Antitrust Litig.*,
  367 F. Supp. 2d 675 (D.N.J. 2005) .................................................................26

*Seattle Totems Hockey Club, Inc. v. National Hockey League,*
    783 F.2d 1347 (9th Cir. 1986) ................................................................20

*Serpa Corp. v. McWane, Inc.,*
    199 F.3d 6 (1st Cir. 1999)................................................................19, 28

*Sledge v. District of Columbia,*
    869 F. Supp. 2d 140 (D.D.C. 2012) ..........................................................7

*Smith v. Conseco Life Ins. Co.,*
    No. 2:13-cv-5253, 2014 U.S. Dist. LEXIS 92123 (D.N.J. July 8, 2014) ..................9

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993)...................................................................18, 20

*State v. New Jersey Trade Waste Ass'n,*
    472 A.2d 1050 (N.J. 1984)..................................................................16

*Sterling Merch., Inc. v. Nestle S.A.,*
    656 F.3d 112 (1st Cir. 2011).................................................................19

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield,*
    373 F.3d 57 (1st Cir. 2004)..............................................................21, 22

*Times-Picayune Publ'g Co. v. U.S.,*
    345 U.S. 594 (1953)........................................................................20

*Trilogy Health Care, LLC v. Medco Health Solutions, Inc.,*
    No. 13-550 (SRC), 2013 U.S. Dist. LEXIS 129385 (D.N.J. Sept. 10, 2013).........12

*U.S. v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956).....................................................................21, 26

*U.S. v. Grinnell Corp.,*
    384 U.S. 563 (1966)........................................................................25

*Uhm v. Humana Inc.,*
    620 F.3d 1134 (9th Cir. 2010) .........................................................13, 14

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange,*
    89 F.3d 233 (5th Cir 1996) .................................................................22

*United States v. Dentsply Int'l,*
    399 F.3d 181 (3d Cir. 2005)................................................................26

*Verizon Commc'ns, Inc., v. Law Offices of Curtis V. Trinko,LLP,*
    540 U.S. 398 (2004).............................................................2, 11, 18, 25

*Weiss v. York Hospital,*
    745 F.2d 786 (3d. Cir. 1984)...............................................................18

**Statutes**

42 U.S.C. § 1395w-26(b)(3) .................................................................................13

42 U.S.C. § 1395w-104(b)(1) ..............................................................................13

42 U.S.C. § 1395w-112(g) ....................................................................................13

N.J.A.C. § 11:24-2.13 (2016) ..........................................................................4, 10

N.J.S.A. 17B:27F-1 to -5 ......................................................................................12

N.J.S.A. 17B:27F-5 ................................................................................................12

N.J.S.A. § 17:1 ........................................................................................................4

N.J.S.A. § 17:48 .............................................................................................3, 4, 11

N.J.S.A.§ 17B:17-18 ...............................................................................................8

N.J.S.A. § 17B:26 .........................................................................................3, 4, 10, 15

N.J.S.A. § 17B:27 ................................................................................................3, 4

**Other Authorities**

42 C.F.R. § 423.440 ...............................................................................................13

42 C.F.R. § 423.505 ...........................................................................................13, 16

70 Fed. Reg. 4194, at 4253-54 (Jan. 28, 2005) ....................................................13

70 Fed. Reg. 4194 at 4665 .....................................................................................14

70 Fed. Reg. at 4253-54 .........................................................................................14

## INTRODUCTION

Defendants Humana Health Plan, Inc., Humana Insurance Company, and Humana Pharmacy Solutions, Inc. ("Humana Subsidiaries") terminated Prime Aid Pharmacy Corporation ("Prime Aid") as an in-network provider after discovering that Prime Aid materially and repeatedly breached Prime Aid's pharmacy provider agreement.  On at least 40 occasions, Prime Aid shipped prescription drugs into Ohio and Florida, states where Prime Aid was not authorized to make such sales.  Not only were Prime Aid's actions unlawful, they were in direct contravention of the agreement.  Notwithstanding the agreement's clear directive that providers terminated for cause may be eligible for reinstatement only after five years, Prime Aid sought reinstatement just one year after being terminated.  The Humana Subsidiaries declined to allow Prime Aid back into the network, adhering instead to the terms of the agreement.  Unhappy with this decision, Prime Aid now seeks by injunction and declaratory action to force Defendants— including Humana Inc., an entity that was not even a party to the agreement with Prime Aid—to enter into a new contract by claiming that Defendants violated New Jersey's Any Willing Provider ("AWP") laws and the federal and state antitrust laws.

Nothing about any of those facts—or any other facts alleged in the First Amended Complaint ("FAC")—even remotely suggests a violation of New Jersey's AWP statutes.  To the contrary, the FAC demonstrates that Defendants have complied with the New Jersey Any Willing Provider statutes.  Even if the FAC had pled facts demonstrating a violation of the statutes, the New Jersey AWP laws did not create a private cause of action as to any Defendants.  Moreover, Prime Aid's claims as to pharmacy benefits covered by Medicare are preempted by the express preemption provision in the Medicare Act.  Finally, Prime Aid has alleged that

Humana Pharmacy Solutions, Inc. ("HPS"), a PBM, has violated the New Jersey AWP statutes even though such laws do not govern the conduct of PBMs.

Prime Aid's antitrust claims are equally without merit. Prime Aid does not—and cannot—plead *facts* (rather than legal conclusions) to support its monopolization and attempted monopolization claims. To the contrary, Prime Aid alleges that it has contracted with approximately 50 insurance companies and PBMs. Prime Aid fails to allege that Defendants engaged in any exclusionary conduct (the Humana Subsidiaries simply exercised their contractual right to terminate Prime Aid). It also relies on an artificially and impermissibly narrow relevant market definition, and it fails to plead facts related to Defendants' purported monopoly power in any relevant market.

Nor has Prime Aid suffered antitrust injury—a threshold requirement to sustain an antitrust claim. To the extent Prime Aid has alleged harm, that harm is to Prime Aid alone, and not the result of any reduction in competition that increases prices, reduces output, or otherwise harms consumers. To the contrary, the harm allegedly suffered by Prime Aid was entirely self-inflicted due to its failure to abide by the terms of its provider agreement.

Prime Aid's Section One claims fail because it has not pled facts in support of its allegation of concerted action. Prime Aid merely alleges that the Humana Subsidiaries terminated a contract due to a breach of contract and refused to re-contract with the breaching party, Prime Aid, for a set period of time. A century of antitrust precedent upholds the "right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" [1] To have any meaning, that right must encompass the prerogative to decline to do business with a provider that violates the terms

---

[1] *See Verizon Commc'ns, Inc., v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

of the parties' agreement.  Because all of Prime Aid's state law and federal antitrust claims are legally deficient, the Court must dismiss those claims with prejudice.

## BACKGROUND AND SUMMARY OF THE ALLEGATIONS

### Party and Industry Background

Plaintiff Prime Aid Pharmacy Corp. ("Prime Aid") is a specialty pharmacy.  FAC at ¶ 1, ECF No. 20.  Humana Inc. is an umbrella company providing insurance products and services, and is the parent company to the remaining Defendants.  *Id*. at ¶ 42.  Defendant HPS is a PBM.  *Id*. at ¶ 43.  Defendant Humana Health Plan, Inc. is a health maintenance organization.  *Id*. at ¶ 44.  Defendant Humana Health Insurance Company offers insurance plans.  *Id*. at ¶ 45.  Humana Inc. and the Humana Subsidiaries are collectively referred to as the "Defendants."

PBMs are the intermediaries between pharmacies and health insurance plans.  *See id. at* ¶ 47.  On one side, PBMs contract with insurance companies, health plans, or self-insured employers to manage prescription drug programs for subscribers.  *Id.*  On the other side, PBMs contract with pharmacies to provide prescription drugs to health plan subscribers.  *Id.*  The contracted pharmacies are referred to as the "provider network."  *See id.* at ¶ 3.  Prime Aid "has contracts with approximately fifty (50) insurance companies/PBMs," including Express Scripts and Good Neighbor.  *Id*. at Ex. K at 2, ECF No. 20-11; *Id.* at Ex. D at 2, 11, ECF No. 20-4.

Competition for health care services occurs on several dimensions.  To compete, the relevant Defendants strive to maintain high quality standards for the PBM network.  *See e.g., id.* at Ex. B at 7, ECF No. 20-2 ("Humana takes violations of state licensing laws very seriously.").

### Regulation of the Pharmacy Benefit Industry

Prime Aid purports to rely on a number of laws codified at N.J.S.A. §§ 17:48-6j, 17:48A-7i, 17:48E-35.7, 17B:26-2.1i, 17B:27-46.1 and 26:2J-4.7 (collectively the "New Jersey AWP

Statutes").  FAC. at ¶ 95.  These laws are enforced by the State Commissioner of Banking and

Insurance.  *See* N.J.A.C. § 11:24-2.13 (2016); N.J.S.A. §§ 17B:26-46, 17B:26-47, 17:1-1.

The statutory provisions cited in the FAC apply to "hospital service corporations"

(N.J.S.A. § 17:48-6j), "medical service corporations" (*Id. at* § 17:48A-7i), "health service

corporations" (*Id.* at § 17:48E-35.7), "individual health insurance policies" (*Id. at* § 17B:26-2.1i),

"group health insurance policies" *(Id. at* § 17B:27-46.1i), and "health maintenance

organizations" (*Id. at* § 26:2J-4.7). FAC ¶ 95.  For each of these sections, a relevant entity

"which provides benefits for pharmacy services, prescription drugs, or for participation in a

prescription drug plan. . ." must not deny a pharmacy or a pharmacist the right to participate "as

a preferred provider or as a contracting provider *under the same terms and conditions currently*

*applicable to all other preferred or contracting* providers . . . *provided the pharmacy* or

pharmacist . . . *accepts the terms and conditions of the policy*."  N.J.S.A. §§ 17:48-6j, 17:48A-7i,

17:48E-35.7, 17B:26-2.1i, 17B:27-46.1i, 26:2J-4.7 (emphasis added).  None of the cited statutes

governs the actions of PBMs like HPS.

### The Agreement

Prime Aid relies significantly on the provider agreement, as amended, between the

Humana Subsidiaries and Prime Aid (the base agreement and amendments are collectively

referred to as the "Agreement").[2]  The Agreement explicitly requires that the pharmacy

"maintain current and unrestricted state and federal licenses" and that it must comply with all

applicable "federal, state, local, and CMS instructions, statutes, ordinances, orders, rules and

regulations. . ."  Exhibit A to the Errico Declaration (Base Agreement) §§ 2.3.1, 2.5.  The

---

[2] The complete Agreement is comprised of (1) a base agreement between the parties (the "Base Agreement")
(attached as Exhibit A to the Decl. of Mark C. Errico in Supp. of Mot. to Dismiss First Am. Compl., dated
September 14, 2016 ("Errico Declaration")); a 2014 amendment to the Base Agreement (the "2014 Amendment")
(attached as Exhibit B to the Errico Declaration); and (3) a 2011 amendment to the Base Agreement (the "2011
Amendment") (attached as Exhibit C to the Errico Declaration).

Agreement also explains that the Humana Subsidiaries may immediately terminate the Agreement for cause, including for Prime Aid's unauthorized distribution of prescription drugs. *Id*. at § 8.3.  In or around March 2014, the Humana Subsidiaries implemented a policy that pharmacies terminated for cause may not reapply to join Humana's Pharmacy Network to the Agreement for a minimum of five years.  *See* FAC at Ex K at 5.  The terms and conditions of the Agreement, specifically Section 8.3, were amended to include language consistent with the policy.  *See* Exhibit B to the Errico Declaration (the 2014 Amendment) at § 8.3.  That amendment was sent to Prime Aid.  *See* FAC, Ex K at 5 (recognizing that Prime Aid knew of the amended policy).

**Prime Aid Breached the Agreement**

Prime Aid admittedly violated state laws on at least forty occasions.  *See* FAC at Ex. C at 4, ECF No. 20-3; *see also* FAC, Ex. A at 2, ECF No. 20-1.  On April 4, 2014, the Humana Subsidiaries notified Prime Aid that they had discovered that Prime Aid illegally dispensed prescription drugs to patients in Ohio and Florida, without the required state licenses.  *Id.*  Prime Aid admitted to the illegal activity.  *See id.* at 6.

Prime Aid also violated the Agreement by delivering prescription drugs through mail delivery services.  *Id.* at Ex. J at 5, ECF No. 20-10.  The Agreement, as amended in 2011, states that Mail Order Pharmacy Services are explicitly excluded from the Agreement.  *See* Exhibit C to the Errico Declaration (2011 Amendment) at § 1.17(c).  Accordingly, Prime Aid Pharmacy's shipment of prescription drugs into any state, regardless of whether it was properly licensed, was also a breach of the Agreement.  *Id.*; *see also* FAC at Ex. J at 5.  Prime Aid admits that it is not licensed as a mail order pharmacy in New Jersey, and that it shipped medications by mail

5

delivery services into at least ten states.  FAC at Ex. J at 5-6.[3]  Accordingly, in the summer of 2014, the Humana Subsidiaries terminated the Agreement with Prime Aid for this illegal activity in breach of the Agreement.  FAC at Ex. J at 8.

In April 2015 (less than one year after the termination), Prime Aid re-applied to participate in Humana's pharmacy network.  FAC at ¶ 25.  The Humana Subsidiaries informed Prime Aid that, consistent with the Agreement's terms, it was "not eligible to participate" in the retail pharmacy network, but would be "eligible to reapply" for a contract five years from the termination date.  *Id.* at Ex. J at 8.

## ARGUMENT

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient, non-conclusory factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Satisfying this burden "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  In deciding a Rule 12(b)(6) motion, a court may consider documents referenced in or expressly linked to a complaint's allegations, matters of public record, as well as undisputedly authentic documents that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.  *See City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998).

---

[3] This is not the only case of Prime Aid acting unlawfully and in derogation of its contracts with various PBMs.  *See Prime Aid Pharm Corp. v. Envision Pharm. Servs. LLC*, Case No. 2:16-cv-02105 (D.N.J. July 5, 2016), ECF No. 10-1 at 5-11; *see also Prime Aid Pharm. Corp. v. Express Scripts, Inc.*, Case No. 2:16-cv-02182 (D.N.J. June 30, 2016) ECF No. 11-1 at 5-6, 11.

Prime Aid's New Jersey AWP claims fail because there are no set of facts that could allow Prime Aid to overcome the legal deficiencies in the FAC. (Part I below).  Prime Aid also cannot plausibly allege any violations of federal or state antitrust laws (Part II below).

I.      **Prime Aid's State Law Claims Are Deficient as a Matter of Law and Must Be Dismissed**

A.      **New Jersey's Any Willing Provider Statutes Do Not Provide for a Private Right of Action, and in Any Event, Do Not Apply to PBMs.**

Through Counts I and II, Prime Aid seeks to enforce the New Jersey AWP Statutes by requesting that this Court (1) declare that Defendants are "required to admit Plaintiff into its Network in accordance with New Jersey's Any Willing Provider statutes" and (2) enjoin Defendants "from rejecting Plaintiff's application to join Defendant's Network."  Prime Aid's claims for injunctive and declaratory relief must fail because they are merely an impermissible attempt to enforce statutes for which there is no private right of action.  Further, the New Jersey AWP Statutes do not govern the conduct of PBMs.

1.      **There Is No Private Right of Action under the New Jersey Any Willing Provider Statutes.**

The New Jersey AWP Statutes do not provide either an express remedy for private parties or the statutory intent from which the Court could create an implied private right.  As an initial matter, there is no express private right of action in the New Jersey AWP Statutes.  Accordingly, Prime Aid must show that, despite any such language, the New Jersey legislature had the statutory intent to provide such a private right to a market competitor such as Prime Aid. Without statutory intent to create a private remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval,* 532 U.S. 275, 286-87 (2001).  There must be "intent to create not just a private right but also a private remedy."  *Id*. at 286.  "[T]he distinction between

rights and remedies is fundamental.  A right is a well-founded or acknowledged claim; a remedy is the means employed to enforce a right or redress an injury.'"  *Sledge v. District of Columbia*, 869 F. Supp. 2d 140, 143 (D.D.C. 2012).  It is the statutory intent regarding whether there is a remedy that "is determinative" for this inquiry.  *Alexander*, 532 U.S. at 286.

Echoing this sentiment, New Jersey courts are "reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action."  *R.I. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A.2d 1132, 1142 (N.J. 2001).  "To determine if a statute confers an implied private right of action, courts consider whether: (1) plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy."  *Id.* at 1143.  "Although courts give varying weight to each one of those factors, the primary goal has almost invariably been a search for the underlying legislative intent."  *Id.*

There is nothing on the face of the New Jersey AWP Statutes which could be read to give rise to a private right of action. *See HM Compounding Servs. v. Express Scripts, Inc.*, No. 4:14-CV-1858 JAR, 2015 U.S. Dist. LEXIS 89062, at *32 (E.D. Mo. July 9, 2015) (applying New Jersey law and agreeing with Defendants that "the law does not give rise to a private right of action.").  The New Jersey AWP Statutes cited by Prime Aid fall within Title 17 ("Corporations and Institutions for Finance and Insurance"), Title 17B ("Insurance") and Title 26 ("Health Maintenance Organization") of the New Jersey Code.  Importantly, the statutes at issue are found within titles that were enacted to protect insured beneficiaries, not providers such as pharmacies. *See e.g.*, N.J.S.A.§ 17B:17-18. (Purpose: "The purpose of this act is to establish minimum standards for language used in policies, contracts and certificates of life insurance, health

insurance, annuity, credit life insurance and credit health insurance, delivered or issued for delivery in this State, to facilitate ease of reading by insureds.").

Moreover, the statutes reveal the legislature intended that the Insurance Commissioner, not private individuals, enforce the statutes. "New Jersey courts have generally declined to infer a private right of action in statutes where the statutory scheme contains civil penalty provisions." *R.I. Gaydos Ins. Agency, Inc.,* 773 A.2d at 1144. "Implied remedies are unlikely to be intended by a Legislature that enacts a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Id.* at 1145 (quotations omitted). Thus, "[i]n the context of insurance statutes, our courts have similarly concluded that where there is no discernable legislative intent to authorize a private cause of action in a statutory scheme that already contains civil penalty provisions, the courts will not infer a private cause of action." *Id.*

Indeed, numerous New Jersey courts have recognized that the legislature simply did not intend to provide a private right of action to enforce insurance statutes because it is an area "where a comprehensive legislative scheme provides enforcement by regulators." *Smith v. Conseco Life Ins. Co.*, No. 2:13-cv-5253, 2014 U.S. Dist. LEXIS 92123, at *7 (D.N.J. July 8, 2014); *see also Assoc. of N.J. Chiropractors, Inc. v. Horizon Healthcare Svcs., Inc.*, No. A-6033-11T4, 2013 N.J. Super. Unpub. LEXIS 2677, at *14 (N.J. Super. Ct. App. Div. Nov. 4, 2013) (affirming the court's finding that a state statute does not allow chiropractors a private right of action because there were no signs of legislative intent, and allowing practitioners a private right of action "would create tension with the [Insurance Commissioner's] extensive regulatory authority"); *Med. Soc'y of N.J. v. AmeriHealth HMO, Inc.*, 376 N.J. Super. 48, 58, (N.J. App. Div. 2005) (affirming a trial court's finding that a statute regarding payment of health care providers does not allow an association of physicians a private right of action); *Am. Millennium*

9

*Ins. Co. v. First Keystone Risk Retention Group, Inc*., 332 Fed. Appx. 787 (3d Cir. N.J. 2009) (holding that certain New Jersey insurance statutes do not provide a private right of action).

Here, the New Jersey AWP Statutes fall within the same Insurance Code.  Title 17B has an enforcement provision that provides for enforcement of the Act by the Commissioner of Banking and Insurance: "If, after notice and hearing, the commissioner finds that an insurance company, agent or broker or any other person has violated the provisions of this act or any regulation promulgated pursuant to this act, he may, in addition to any other penalty, impose a penalty not exceeding $2,000.00 for each such violation, which penalty shall be collected and enforced pursuant to the law." N.J.S.A. § 17B:26-46; *See also id*. § 17B:26-47 (allowing the Commissioner to move for an injunction to remedy statutory violations).  Likewise, an HMO's violation of the applicable statutes (including the New Jersey AWP statute applicable to HMOs) is to be addressed by the Insurance Commissioner.  *See* N.J.A.C. § 11:24-2.13 (2016) (violations by HMOs addressed by commissioner).

Accordingly, the New Jersey AWP Statutes simply do not give rise to a private right of action.  *See HM Compounding Servs.,* 2015 U.S. Dist. LEXIS 89062, at *32 (agreeing with Defendants that "the law does not give rise to a private right of action.").  Courts reviewing claims under other states' "any willing" provider statutes have found the same.  *See J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*, 365 F. Supp. 2d 119, 124-25 (D. Mass. 2005) ("the Court dismissed the claim under the [Massachusetts] Any Willing Provider Law, since it did not give rise to a private cause of action"); *see also Quality Infusion Care, Inc. v. Humana Health Plan of Tex., Inc.*, 290 Fed. App'x. 671, 681 n.12 (5th Cir. 2008) ("As counsel for Humana observed at oral argument, the [Any Willing Provider] provisions . . . do not present a civil penalty or other cause of action independently available to a private third party.").

Prime Aid cannot circumvent this lack of private right of action by seeking to enforce the statute through declaratory and injunctive relief.  First, injunctive relief is a remedy—not an independent cause of action.  *See Chruby v. Kowaleski*, 534 Fed. Appx. 156, 160 n.2 (3d Cir. 2013) ("an injunction is a remedy rather than a cause of action, so a separate claim for injunctive relief is unnecessary.").

Further, where, as here, there is no private right of action under a statute, a claim for declaratory or injunctive relief seeking to enforce that statute must be dismissed.  "Plaintiffs cannot recast their claims of [statutory] violations, for which there is no private right of action, as one for declaratory judgment and injunctive relief.  ***Because there is no private cause of action, the claim for declaratory and injunctive relief fails as a matter of law***."  *Glanville v. Dupar, Inc.,* 727 F. Supp. 2d 596, 602 (S.D. Tex. 2010) (emphasis added); *see also In re: New Jersey Firemen's Ass'n Obligation to Provide Relief Applications under Open Public Records Act*, 443 N.J. Super. 238, 253 (App. Div. 2015) ("if there is no private right of action under a particular statute, a party may not secure a declaration of its statutory rights by seeking relief under the DJA.")[4]

## 2.      The New Jersey AWP Statutes Do Not Apply to PBMs

The New Jersey AWP Statutes cited by Prime Aid in the FAC do not apply to PBMs like Defendant HPS.  Those statutes specifically apply to "hospital service corporations" (N.J.S.A. § 17:48-6j), "medical service corporations" (*Id*. at § 17:48A-7i), "health service corporations" (*Id*. at § 17:48E-35.7), "individual health insurance policies" (*Id*. at § 17B:26-2.1i), "group health

---

[4] Nor can the state and federal antitrust laws form the bases for Prime Aid's requested injunction to compel a private contractual relationship.  As the Supreme Court has recognized, "compelling" firms to do business together is in "tension with the underlying purpose of antitrust law" and would "require[] antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited."  *Trinko*, 540 U.S. at 408.  Plainly, Prime Aid is not entitled to the relief it seeks as a matter of law.

insurance policies" (Id. at § 17B:27-46.1i), and "health maintenance organizations" (*Id*. at § 26:2J-4.7). FAC. ¶ 95. Indeed, there is no AWP law in New Jersey that governs PBMs at all. To that end, at least two courts have held that there are no "colorable" arguments that New Jersey AWP laws apply to PBMs, rather than insurers. *See Trilogy Health Care, LLC v. Medco Health Solutions, Inc.*, No. 13-550 (SRC), 2013 U.S. Dist. LEXIS 129385, at *7 (D.N.J. Sept. 10, 2013) (dismissing claim where plaintiff had not offered "even a colorable argument" that a particular AWP statute gives rise to a private right of action against a PBM rather than an insurer.); *HM Compounding*, 2015 U.S. Dist. LEXIS 89062, at *31-32 (following *Trilogy*).

The New Jersey legislature has confirmed this understanding by recently enacting statutory provisions governing PBMs (Chapter 27F or Title 17B)—none of which contain an "any willing provider" law or provide a private right of action to enforce the provisions. *See* N.J.S.A. 17B:27F-1 to -5. To the contrary, like the New Jersey AWP Statutes, the PBM statutes authorize the Commissioner of Banking and Insurance to adopt rules and regulations, including any penalty provisions the commissioner deems to be necessary, to effectuate the purposes of the PBM statute. *See* N.J.S.A. 17B:27F-5. This is just another reason to dismiss the claims against HPS.

**B.      Prime Aid's Claims Directed at Medicare Pharmacy Benefits Are Preempted.**

Prime Aid's Agreement with the Humana Subsidiaries covers both commercial and Medicare pharmacy benefits. Ex. A to the Errico Declaration § 1.11. To the extent Prime Aid's claims are directed at pharmacy benefits covered by Medicare, those claims are preempted by federal law. Congress specifically intended the federal standards to override state standards, including the New Jersey AWP Statutes and Prime Aid's related claims for relief: "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land;

12

and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Arizona v. U.S.,* 132 S. Ct. 2492, 2500 (2012).

Congress enacted legislation that explicitly governs the same subject matter as the New Jersey AWP Statutes. CMS contracts with private health care organizations ("Sponsors") to offer prescription drug plans to Medicare beneficiaries. *See Uhm v. Humana Inc.,* 620 F.3d 1134, 1138 (9th Cir. 2010). In so doing, Congress requires that a "prescription drug plan shall permit the participation of any pharmacy that meets the terms and conditions under the plan." 42 U.S.C. § 1395w-104(b)(1) (the "Federal Statute"). CMS enforces the Federal Statute by requiring that the Sponsor complies with those provisions. *See* 42 C.F.R. § 423.505(18) (one of the contract terms requires Sponsors to have a standard contract accessible to any pharmacy that can meet the contract's terms). In implementing the Federal Statute, CMS emphasized that Sponsors could structure their contractual arrangements as they saw fit, providing "Part D plans with ***maximum flexibility*** to structure their standard terms and conditions." 70 Fed. Reg. 4194, at 4253-54 (Jan. 28, 2005) (emphasis added).

The Congressional "federal standards" discussed above expressly preempt state laws. Congress enacted an express preemption provision for Medicare Part D plans, providing that standards established for Part D plans "shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency)." 42 U.S.C. § 1395w-26(b)(3); 42 U.S.C. § 1395w-112(g) (applying standard to Part D plans). CMS confirmed the express preemption provision in the following regulation: "The standards established under this part supersede any State law or regulation (aside from State licensing laws or State laws relating to plan solvency) for Part D plans offered by Part D plan sponsors." 42 C.F.R. § 423.440.

Preemption bars claims brought under a state statute where "application of the[] state law could potentially undermine the [Part D] standards. . . ." *Uhm,* 620 F.3d at 1152. "A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach that goal." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992).  Thus, "all State standards, *including those established through case law,* are preempted to the extent they specifically would regulate [Medicare Advantage] plans, with exceptions of State licensing and solvency laws." 70 Fed. Reg. 4194 at 4665. (emphasis added); *See also Uhm,* 620 F.3d at 1152 (holding that plaintiffs' state common law claims were preempted by the Medicare express preemption provision).

Prime Aid's claims would undermine the federal standards related to Medicare pharmacy benefits.  By enacting the express preemption provision, Congress intended that CMS, not individual pharmacies, regulate private health care organizations offering prescription drugs. Prime Aid's claims impermissibly seek to deny CMS its authority to enforce the provisions of its contracts with private health care organizations by demanding a new rule that was not promulgated by CMS through the normal rule-making process.  In essence, Prime Aid seeks a declaration that private health care organizations may not require certain standard terms and conditions for its network pharmacies, even though such terms and conditions are approved by CMS, which affords Sponsors with "maximum flexibility" in establishing terms and conditions, 70 Fed. Reg. at 4253-54.  Accordingly, the claims are preempted and should be dismissed.[5]

---

[5] Even if the New Jersey AWP Statutes were not expressly preempted, the claims are preempted under the doctrine of conflict preemption.  "Even where Congress has not completely displaced state regulation . . . state law is nullified to the extent that it actually conflicts with federal law." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153 (1982).  A conflict between such laws exists where either compliance with both is a physical impossibility, or "when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Id.*  For the same reasons as discussed above, this Court's enforcement of the New

**C.     Prime Aid Has Failed To Plausibly Allege That Defendants Violated the New Jersey Any Willing Provider Statutes**

Prime Aid's claims for declaratory and injunctive relief fail as a matter of law because, even accepting all the allegations in the FAC as true, Defendants complied with the New Jersey AWP Statutes.  The New Jersey AWP Statutes require that insurers, HMOs and other entities that provide pharmacy services must not preclude a pharmacy from participating as a "preferred provider" if, and only if, that pharmacy "accepts the terms and conditions of the policy" and that such "terms and conditions" are ones that are "currently applicable to all other preferred or contracting providers."  *See e.g.*, N.J.S.A. § 17B:26-2.1i(a)(2).  There is nothing in the New Jersey AWP Statutes or the corresponding regulations that seek to further limit what may be included in a policy's "terms and conditions."  Instead, the New Jersey legislature left open what terms an insurer may include in their policies.

The Humana Subsidiaries complied with the statutes.  Prime Aid entered into the Agreement with certain Humana Subsidiaries, and that Agreement was terminated for cause. FAC ¶ 68; *see also id.* at Ex. J at 2.  Prime Aid does not dispute that, prior to its termination, the Humana Subsidiaries implemented a policy that pharmacies terminated for cause may not be eligible for reapplication for a minimum of five years.  *See* FAC at Ex K at 5.  Similarly, Prime Aid does not dispute that Section 8.3 of the Agreement, as amended, includes language consistent with the policy. *See* Exhibit B to the Errico Declaration (the 2014 Amendment) at § 8.3; *see also* FAC, Ex K at 5.

Prime Aid also does not assert that the five-year reinstatement "term and condition" is unique to Prime Aid's Agreement.  Such a term and condition is "policy" incorporated into all

---

Jersey AWP Statutes in the manner suggested by Prime Aid would conflict directly with CMS's regulatory structure.

standard agreements.  *See* FAC at Ex. K at 5 (noting that the Humana Subsidiaries "implemented a policy that pharmacies terminated for cause may not be eligible for reapplication for a minimum of five years."); *See also* 42 C.F.R. § 423.505(a)(18) (requiring Medicare Part D Sponsors, "to agree to have a standard contract with reasonable and relevant terms and conditions of participation whereby any willing pharmacy may access the standard contract and participate as a network pharmacy").

Nonetheless, Prime Aid attempted to circumvent this provision by applying for re-entry only one year after Prime Aid was terminated for cause.  *See* FAC at ¶ 25.  Prime Aid knew of the five-year exclusionary period, and concedes that it was seeking to violate the terms and conditions of the Agreement by applying to the network well before the five-year period lapsed. *See id.*  The Humana Subsidiaries' decision to follow the terms of the Agreement, and require Prime Aid to also follow those terms—which are the same terms that are applicable to all other pharmacies as well—did not violate the New Jersey AWP Statutes.

## II.    Prime Aid's Antitrust Claims Should Be Dismissed as a Matter Of Law.

Prime Aid's federal and state antitrust claims fail as a matter of law.[6]  A claim for monopolization under either statute requires: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010).  Similarly, attempted monopolization requires: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous

---

[6] The relevant provisions of the New Jersey Antitrust Act "'shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes.'"  *Eisai Inc. v. Sanofi Aventis U.S. LLC*, No. 14-2017, 2016 U.S. App. LEXIS 8148, at *11-12 n.11 (3d Cir. 2016) (quoting *State v. New Jersey Trade Waste Ass'n*, 472 A.2d 1050, 1056 (N.J. 1984)).

probability of achieving monopoly power." *Id.* A plaintiff claiming a restraint of trade "must show concerted action, antitrust injury, evidence that the conspiracy produced 'adverse, anti-competitive effects within the relevant product and geographic markets,' and evidence 'that the objects of and the conduct pursuant to the conspiracy were illegal.'" *Id.* at 74 (internal quotation omitted). A failure to properly plead even one of those elements is fatal to an antitrust claim. Prime Aid's pleading deficiencies are legion: It has not and cannot plead facts establishing (1) cognizable exclusionary conduct; (2) relevant antitrust markets; (3) monopoly power or a "dangerous probability" of achieving monopoly power in any relevant antitrust market; (4) any cognizable antitrust injury, or (5) concerted action (for its restraint of trade claims). Each one of these pleading failures alone compels dismissal.

As a threshold issue, an inherent, overarching flaw infects both of Prime Aid's antitrust claims: Prime Aid impermissibly seeks to use the antitrust laws to guarantee itself a place in Defendants' distribution chain indefinitely. Such a claim is antithetical to the purpose of antitrust, which is to promote *competition*, not complacency. The Supreme Court has often re-emphasized "the economic value of allowing businesses to decide with whom they will deal. . . ." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1194 (10th Cir. 2009) (citing *Trinko,* 540 U.S. at 408 ("the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'") (alteration in original)). "The antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path." *Christy Sports*, 555 F.3d at 1198.

### A.    Defendants Have Not Engaged in Exclusionary Conduct.

Prime Aid's claims under Sherman Act Section 1 (unreasonable restraints of trade) and Section 2 (monopolization) both fail because Prime Aid does not and cannot plead any cognizable basis to conclude that any of the Defendants has engaged in *exclusionary conduct, i.e.*, conduct that harms the competitive process and involves the acquisition or maintenance of monopoly power through improper means[7], or conduct that raises prices and reduces output[8]. Instead, Prime Aid merely asserts that Defendants terminated a distributor (Prime Aid) for illegally distributing pharmaceuticals and *unilaterally* declined to renew a contract with that distributor for five years (as it would with any distributor terminated for cause).  But the Supreme Court has long recognized the right of a firm to decline to do business with another— even if the firm possesses monopoly power (which, as discussed below, Defendants plainly do not).  *See Trinko*, 540 U.S. at 408.  Courts have been "very cautious in recognizing [any] exceptions [to this rule], because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."  *Id.*  For this reason, "a unilateral refusal to deal has formed the basis of a successful Section 2 claim" in virtually no cases.  *Data Gen. Corp. v. Grumman Support Sys. Corp.*, 36 F.3d 1147, 1183 (1st Cir. 1994).

Prime Aid attempts to evade these precedents by alleging that Defendants improperly terminated its contract without due process and then refused to allow Prime Aid to reapply for a contract, in violation of New Jersey Law.  *See* FAC at ¶¶ 68-89.  These allegations are insufficient for multiple reasons.  *First*, a decision to terminate a contract for cause does not give rise to an antitrust claim.  *See Weiss v. York Hosp*, 745 F.2d 786, 820 n.60 (3d. Cir. 1984) (hospital can exclude an unqualified or unprofessional applicant from staff privileges, "so long as

---

[7] *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

[8] *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 104-05 (1984).

the hospital applies the same standards to all applicants."). In *Christy Sports*, for example, the court upheld dismissal of a Section 2 claim that was premised upon defendant's termination of a plaintiff's exclusive license to operate a rental business at defendant's resort. 555 F.3d at 1190. The court reasoned that the plaintiff was aware that the contractual relationship could change and was subject to the defendant's business judgment. *Id.* at 1197. Similarly here, Prime Aid's Agreement with the Humana Subsidiaries contained a clause allowing immediate termination for breach of contract by the pharmacy, as well as a clause stipulating that all pharmacies terminated for cause may not be eligible for re-contracting for a minimum of five years. Thus, Prime Aid was sufficiently alerted that when it breached the Agreement, the Humana Subsidiaries could end the contractual relationship. *See id.* at 1198 (defendant "should not be forever locked into a business decision . . . , especially when it took an affirmative step to preserve its future flexibility").

*Second*, courts have repeatedly held that it does not violate the antitrust laws for a firm to terminate a distributor and vertically integrate into the distribution business itself. *See Sterling Merch., Inc. v. Nestle S.A.*, 656 F.3d 112, 124-25 (1st Cir. 2011) (denying § 2 claim because "once a firm . . . has integrated vertically into distribution . . , it may reduce costs by dealing only with its wholly-owned distributors"); *see also Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 12 (1st Cir. 1999) (dismissing § 2 claim where exclusive distributor's injuries resulted from termination in favor of wholly-owned distributors). Contrary to Prime Aid's mischaracterizations, there is nothing anticompetitive about Humana Inc. or its Subsidiaries owning a specialty or a mail order pharmacy. Defendants are not preventing Prime Aid from selling specialty pharmaceuticals, but have simply removed Prime Aid from its distribution chain, which alone does not constitute exclusionary conduct. *See Sterling Merch.*, 656 F.3d at 124-25; *see also Serpa*, 199 F.3d at 10-

19

11; *Christy Sports*, 555 F.3d at 1197; *Seattle Totems Hockey Club, Inc. v. National Hockey League*, 783 F.2d 1347, 1350 (9th Cir. 1986) (not anticompetitive to deny membership in a league when plaintiff failed to meet conditions precedent).

Importantly, Prime Aid failed to give any concrete examples of how its termination as a distributor has reduced output, increased price, or reduced quality. *See* FAC at ¶ 135 (conclusory sentences that the effect of Humana's agreements with health plans prevent Prime Aid from serving "insureds in the Humana Network."). Without such examples, Prime Aid has not alleged any cognizable antitrust conduct. *See Eisai*, 2016 U.S. App. LEXIS, at *15, 21, 23-25. The lack of concrete factual allegations similarly confirms that Prime Aid cannot establish "specific intent" – another requirement of its attempted monopolization claim. Specific intent does not mean "intent to compete vigorously." *Spectrum Sports*, 506 U.S. at 459. Rather, it entails "a specific intent to destroy competition or build monopoly." *Times-Picayune Publ'g Co. v. U.S.*, 345 U.S. 594, 626 (1953). Prime Aid asserts that Defendants' decision to terminate Prime Aid from its PBM network "has been undertaken with a specific intent to monopolize. . . ." FAC at ¶153. Such conclusory allegations fail to satisfy an essential element of the offense and are entitled to no consideration.

### B. Prime Aid Has Not Pled a Proper Relevant Market

Prime Aid also fails to plausibly allege a legally cognizable relevant product and geographic market in which trade was monopolized. *See Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997). A plaintiff must define a plausible relevant market by alleging *facts*—not mere legal conclusions—regarding substitute and non-substitute products and relating to cross-elasticity of demand. *See id.* (affirming dismissal where "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all

interchangeable substitute products . . . .").  Prime Aid does not and cannot meet that burden here.

### 1.    No Facts Support the Alleged Product Market.

A relevant product market includes all products that are deemed "reasonably interchangeable by consumers for the same purpose."  *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *see also Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997) ("we have explicitly rejected the proposition that a firm can be said to have monopoly power in its own product, absent proof that the product itself has no economic substitutes.").  The fundamental premise of Prime Aid's antitrust claims, however, is that a ***single*** component of a ***single*** brand is the relevant product market to assess Prime Aid's foreclosure: "[T]he market for specialty pharmacy services to New Jersey insureds who are locked in" to Humana's PBM.  FAC at ¶¶ 108, 113, 114.  This allegation is insufficient for multiple reasons.

*First*, Prime Aid has alleged a relevant market that does not encompass all interchangeable substitute products.  The relevant market is determined by which products Prime Aid would find to be reasonable substitutes for Humana members who purchase specialty pharmacy services.  In *Brokerage Concepts v. United States Healthcare*, a pharmacy sued U.S. Healthcare for its refusal to approve the pharmacy's application for membership in the network of medical prescription providers.  140 F.3d 494, 501 (3d Cir. 1998).  The plaintiff alleged a single brand market consisting solely of U.S. Healthcare members with prescription drug benefits.  *Id.* at 513.  The court determined that the product market should be determined from the point of view of which products the *plaintiff* would find to be substitutes for prescription drug-purchasing members of U.S. Healthcare.  *Id.* at 514.  Thus, the correct relevant market included members of other prescription plans and uninsured persons, along with U.S. Healthcare members.  *Id.*; *see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57,

67 (1st Cir. 2004) (relevant market for "a shut-out supplier is with the available market *for the supplier*" and includes uninsured and unreimbursed retail customers for prescription drugs). When the alleged market is too narrow, it "cannot stand as a matter of law." *Brokerage Concepts*, 140 F.3d at 513.

Prime Aid, however, suggests a relevant product market that is too narrow because Prime Aid fails to allege substitutes for Humana insureds even though it clearly acknowledges that "several" PBM networks exist, which include specialty pharmacy services. FAC at ¶ 22; *see also id*. ¶¶ , 17, 48, 111, 131, 154 (all recognizing the existence of multiple PBM networks). And indeed, "Prime Aid . . . has contracts with approximately fifty (50) insurance companies/PBMs." *Id.* at Ex. K at 2. Prime Aid also belongs to Good Neighbor, another PBM network and Express Scripts. *Id.* at Ex. D at 2. Further, the FAC fails to address how many or the size and relative position of PBMs operating in New Jersey or in the United States, and contains no factual allegations of the extent to which Prime Aid may or may not turn to those substitute PBMs, much less any cross-elasticity of demand between them. *See Stop & Shop*, 373 F.3d at 67 (impact of foreclosure on pharmacies depended on how many unforeclosed customers remained elsewhere). Prime Aid likewise fails to provide any allegations as to (1) whether it has alternatives to PBMs generally as sources of customers, and (2) the extent, if any, of the commercial importance to pharmacies of participation in the Humana network relative to alternative sources of business such as other PBMs or non-PBM sources of customers.

Relatedly, Prime Aid cannot use the contractual restraints of Defendants' members to define a relevant product market that is narrower than the reasonably interchangeable products. *See e.g., Queen City Pizza*, 124 F.3d at 438 (courts will not look to contractual restraints in defining relevant markets); *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange*, 89

F.3d 233, 236 (5th Cir 1996) ("Economic power derived from contractual arrangements such as franchises or in this case, the agent's contract with Farmer's, has nothing to do with market power, ultimate consumer's welfare, or antitrust."); *Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 85 (2d Cir. 2000) (abrogated on other grounds) ("[e]conomic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as the basis for a monopolization claim.").  Prime Aid's attempt to artificially and improperly narrow the relevant product market is insufficient as a matter of law.

*Second*, a market definition is implausible where, as here, it "singles out a small component of [a] cluster of services that constitutes the actual product. . . ." *Christy Sports*, 555 F.3d at 1196.  In *Christy Sports*, for example, a ski resort terminated a contract with a competing ski rental outfit to provide rentals at the resort.  *See id.* at 1191.  The plaintiff alleged this was an attempt to monopolize the market for ski rentals at the defendant's resort.  *See id.*  The court affirmed dismissal of the claim because the complaint did not allege that "destination skiers are choosing their ski resort based on the price of rental skis, separate and apart from the cluster of services associated with the destination-ski experience.  To define one small component of the overall product as the relevant product market is simply implausible." *Id.* at 1194.  Additionally, the plaintiff did not allege that foreclosure in the ski rental business at defendant's resort would have any effect on the competitive ski resort industry.  *See id.* at 1195.

The FAC suffers from substantially similar flaws.  Prime Aid alleges that because it competes against Defendants' specialty pharmacy subsidiary, that the lawful termination of the Agreement is Defendants' attempt to monopolize the market for specialty pharmacy services within Humana's PBM network.  Prime Aid, however, has not alleged that consumers choose their health insurance plan based on the price of specialty prescription services separate and apart

from the overall cluster of services associated with health insurance. In other words, Prime Aid implausibly defines one small component of the overall product as the relevant product market. Additionally, Prime Aid fails to support such a narrow market with any allegation that the PBM industry is not competitive. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) (discarding plaintiff's alleged relevant market of acute care hospitals used by Humana insureds because there was no evidence of monopoly power in the health insurance market). Such threadbare, conclusory allegations and "formulaic recitation of the elements of a cause of action" are inadequate as a matter of law. *Twombly*, 550 U.S. at 555.[9] Accordingly, Prime Aid has failed to properly allege a relevant product market.

### 2. No Facts Support the Alleged Geographic Market.

A relevant geographic market is "the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Brokerage Concepts,* 140 F.3d at 515. Prime Aid's allegation that the relevant geographic market is the State of New Jersey is insufficient because Prime Aid's own conduct demonstrates that purchasers can turn to out of state sellers or mail order pharmacies if Defendants were to raise prices or reduce output on specialty pharmacy services. *See* FAC at ¶ 111. Prime Aid, for example, admits that it serviced customers in Florida and Ohio and did not deny that it shipped prescriptions by Federal Express into eight other states or territories. *See Id.* at ¶ 74; *see also id.* at Ex. B at 6-7; *id.* at Ex. C at 4; *id.* at Ex. E at 2, ECF No. 20-5 ("Humana has evidence that [Prime Aid] shipped prescription drugs into New York, Pennsylvania, Connecticut, Delaware, Georgia, Puerto Rico, Rhode Island and West Virginia. [Prime Aid] has not disputed that it shipped prescription drugs via federal express to these

---

[9] In *Twombly*, the Supreme Court made clear that a plaintiff cannot sidestep its obligations to allege a plausible market by arguing that discovery will produce evidence to substantiate its claims. This is particularly true in antitrust cases, with notably high discovery costs. *See Id.* at 558.

states, . . .").   And most importantly, Prime Aid is complaining that it is losing sales to Defendants' mail order pharmacy which, Prime Aid notably alleges, "has no physical presence in New Jersey and fills all New Jersey prescriptions by mail order."   FAC at ¶ 1.   Prime Aid's failure to plausibly allege a relevant geographic market requires dismissal of the Antitrust claims.

### C.    Prime Aid Has Not Pled Facts to Show Monopoly Power in Any Relevant Market.

Prime Aid also fails to plead a plausible claim that Defendants possess monopoly power in *a valid relevant market*.  Conclusory allegations that Defendants maintain a 65% market share in "the market for specialty pharmacy services to New Jersey insureds who are locked in" to Humana's PBM cannot withstand scrutiny.   FAC at ¶¶ 108, 113, 114.   Allegations of monopolization or market share in an implausible relevant market cannot be used to withstand a motion to dismiss. *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1215 (11th Cir. 2002) ("a defendant's market share in a market other than the alleged relevant market is irrelevant…"); *Avery Dennison Corp. v. Acco Brands, Inc.*, No. CV 99-1877 DT., 2000 U.S. Dist. LEXIS 3938, at *40 (C.D. Cal. Feb. 22, 2000) ("share of some market other than the relevant product market is irrelevant to the determination of market share.").

Moreover, even if Prime Aid's purported relevant product market were sufficient (it is not for the reasons set forth above), Prime Aid still does not sufficiently allege that Defendants possess or have a "dangerous probability" of achieving monopoly power in its alleged market—a necessary element of a Section 2 claim.  *Trinko*, 540 U.S. at 407.  "Monopoly power" is defined as the "power to control prices or exclude competition."  *U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  This is typically established by showing that a defendant has a "dominant share" of the relevant market protected by entry barriers[10], and courts have set a high threshold for this

---

[10] *See Harrison Aire, Inc. v. Aerostar Int'l*, 423 F.3d 374, 381 (3d Cir. 2005).

showing.  *See, e.g., Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992) (80%

to 95%); *United States v. Dentsply Int'l*, 399 F.3d 181, 187 (3d Cir. 2005) (75% to 80%).   As the

Third Circuit has explained, a "***significantly*** larger market share than 55 percent has been

required to demonstrate prima facie monopoly power."  *Fineman v. Armstrong World Indus.*,

980 F.2d 171, 201-202 (3d Cir. N.J. 1992).  Thus, a well-accepted formulation is that "90% is

enough, ***60% is not likely to suffice***, and 33% is insufficient to constitute monopoly power."  *Id.*

(emphasis added); *see also Int'l Boxing Club of New York, Inc. v. U.S.*, 358 U.S. 242, (1959)

(81%).  Accordingly, Prime Aid's singular, unsupported allegation that Defendants fill 65% of

their members' prescriptions is simply insufficient as a matter of law to show a "dangerous

probability of achieving monopoly power."

Importantly, Prime Aid's allegations of purported market share stands alone, and the

FAC is devoid of any allegations that Defendants exhibit any of the traditional traits of a

monopolist.  Missing from the FAC is any non-conclusory claim (much less any alleged facts)

suggesting that Humana's specialty pharmacy has "the power to control prices or exclude

competition."  *See du Pont*, 351 U.S. at 391.  Monopoly power cannot be found without

factually-supported allegations of abnormally high price-cost margin and restricted output.  *See*

*Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.*, No. 12-3824, 2015 U.S. Dist. LEXIS 50026, at

*21 (E.D. Pa. Apr. 16, 2015) ("'[W]ithout evidence that sheds light on material factors such as

[the alleged monopolist's] price relative to its total costs (marginal and fixed) and whether output

was restricted, monopoly power cannot be found as a matter of law.'") (quoting *In re Remeron*

*Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 681 n.10 (D.N.J. 2005)).  To the contrary,

Prime Aid alleges that competition exists in New Jersey:  four specialty pharmacies are

physically located and competing in New Jersey, Humana's specialty pharmacy is competing in

New Jersey, and PBMs grant reciprocal rights to use specialty pharmacies within their networks. FAC at ¶¶ 59, 152, 154.

Because the FAC contains no allegations of fact to even suggest monopoly power, dismissal is required. *See Crossroad Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 142 (3d Cir. 1998)(affirming dismissal of § 2 claims where plaintiff did not allege market share, strength of competition, probable development of the industry, barriers to entry, or elasticity of demand).

### D. Prime Aid Has Not Pled Facts Supporting its Claim of Antitrust Injury.

Prime Aid's antitrust claims also should be dismissed because Prime Aid has no sufficiently pled antitrust injury. A private antitrust plaintiff must plead (and ultimately prove) that it suffered "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the defendant's] acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "'An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, . . .' not just his own welfare." *Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 437 (M.D. Pa. 2003), *aff'd*, 423 F.3d 184 (2005). "Absolute choice of [providers] is not guaranteed to customers of a health insurer. This does not make it an anti-trust violation every time a health insurer decides not to grant in-network status to a healthcare provider. Plaintiff must be able to plausibly allege with non-speculative facts . . . an anti-competitive effect, such as higher prices for consumers of healthcare . . . ." *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, No. 4:16-cv-00057, 2016 U.S. Dist. LEXIS 74571, at *26 (N.D. Okla. June 8, 2016). And even "if the plaintiff is successful in proving that output dropped or quality suffered, the plaintiff must still demonstrate that the defendant's conduct proximately caused the detrimental effect on competition." *Gordon*, 272 F. Supp. 2d at 437(citation omitted); *see also id.* at 441 (holding

termination of doctor's admitting privileges not an antitrust violation where plaintiff's "conscious decision to violate the Conditions [to the agreement], rather than the decision to impose the Conditions, caused the injury to competition.").

While Prime Aid pleads why it may be harmed, it has not properly alleged the relevant injury **to competition** as a result of the Humana Subsidiaries' refusal to contract with Prime Aid for five years. *Serpa Corp.*, 199 F.3d at 11 ("Clearly lacking antitrust injury . . . is the firm whose injury is caused merely by the efficiency effects of a vertical merger. . . .as long as there were alternative sources of the product."). Although Prime Aid alleges that it can no longer participate in Humana's network (at least for the next three years), it gives no indication that its termination from the network has materially reduced the overall level of competition in the alleged relevant market. Instead, Prime Aid relies on the conclusory notion that it provides superior quality, but it fails to provide any factual allegation that ties its purported exclusion to an overall reduction in quality in the market. *See e.g., Novak v. Somerset Hosp.*, No. 3:07cv304, 2014 U.S. Dist. LEXIS 138028, at *60-61 (W.D. Pa. Sept. 30, 2014) (no competitive harm where the plaintiff failed to demonstrate that the purported exclusion led to a "a reduction of output, an increase in price, or deterioration in the quality of goods or services").

Likewise, Prime Aid alleges no facts regarding other specialty pharmacies in the Humana network and, specifically, how the termination of Prime Aid from the Defendants' network could possibly impact existing competition from those entities. Instead, by its own admission, Prime Aid remains "by far, the largest of approximately five (5) independent specialty pharmacies in the state of New Jersey," and as of June 2015, approximately a year after its termination, had "working relationships with most of the premier hospitals in the State" and "contracts with approximately fifty (50) insurance companies/PBMs." FAC at ¶ 133; *see also id.* at Ex. K at 2.

Moreover, Prime Aid concedes that its exclusion from Humana's network will have no effect on prices given that Humana Inc. already sets the prices for all providers.  *See id.* ¶ 115. Accordingly, this lack of antitrust injury provides an independent reason why Prime Aid's antitrust claims should be dismissed with prejudice.

### E.   Prime Aid Has Not Pled the Requisite Concerted Action for a Section One Claim.

In addition to failing to plead the restraint of trade element of a Section One claim,  s*ee supra*, II.A, Prime Aid has failed to allege that the Defendants have engaged in any concerted action with others to terminate Prime Aid from the network.  To allege an antitrust agreement, "a plaintiff must allege facts plausibly suggesting 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l Inc.*, 602 F.3d 237, 254 (3d Cir. 2010).  "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557.  While Prime Aid alleges that Defendants have agreements with unnamed health plans that grant it "exclusive rights to act as PBM for those health plans and employers . . .", it does not allege that those agreements required, or were in any way related to, the decision to terminate Prime Aid.[11]  FAC. ¶¶ 126, 163;  *see also McCullough v. Zimmer Inc.*, 382 Fed. App'x 225, 230 n.6 (3d Cir. 2010) (affirming dismissal where plaintiffs "alleged no facts suggesting that Defendants agreed to act in concert.").  Prime Aid's failure to allege the existence of concerted action requires dismissal of its Section 1 claim.

---

[11] Prime Aid also cannot colorably allege that Humana Inc. conspired with other Defendants to exclude Prime Aid from the network.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)(concerted action cannot be solely between a parent corporation and its own subsidiaries); *Eichorn v. AT&T Corp*, 248 F.3d 131 (3d Cir. N.J. 2001) (citing *Copperweld* to support its conclusion that as "a single entity in a parent subsidiary relationship, the defendants in this case were incapable of conspiring to violate the antitrust laws through the Preliminary Net agreement.").

## **CONCLUSION**

For the foregoing reasons, the FAC should be dismissed with prejudice.

Dated: September 14, 2016                    Respectfully submitted,

                                             SQUIRE PATTON BOGGS (US) LLP

                                             By:  s/ Mark C. Errico_____
                                                     Mark C. Errico

                                             The Legal Center
                                             One Riverfront Plaza
                                             1037 Raymond Blvd.
                                             Newark, New Jersey 07102
                                             Telephone:     973-848-5600
                                             Facsimile:     973-848-5601
                                             Mark.Errico@squirepb.com

                                             Kimberly J. Donovan (admitted *pro hac vice*)
                                             kimberly.donovan@squirepb.com
                                             Rachael A. Harris (admitted *pro hac vice*)
                                             rachael.harris@squirepb.com
                                             Squire Patton Boggs (US) LLP
                                             2550 M Street Northwest
                                             Washington, D.C. 20037
                                             T: 202-457-6000
                                             F: 202-457-6315

                                             Attorneys for Defendants
                                             HUMANA INC., HUMANA PHARMACY
                                             SOLUTIONS, INC., HUMANA HEALTH  PLAN,
                                             INC., and HUMANA INSURANCE COMPANY