UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION

| | |
|---|---|
| PRIME AID PHARMACY CORP., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    CIV. A. No.: 2:16-cv-02104-SDW-SCM |
| | : |
| HUMANA INC., HUMANA PHARMACY | : |
| SOLUTIONS, INC., HUMANA HEALTH PLAN, | : |
| INC. and HUMANA INSURANCE COMPANY, | : |
| | : |
| Defendants. | : |

**PLAINTIFF PRIME AID PHARMACY CORP.'S SECOND AMENDED COMPLAINT
AGAINST DEFENDANTS HUMANA INC., HUMANA PHARMACY SOLUTIONS,
INC., HUMANA HEALTH PLAN, INC. AND HUMANA INSURANCE COMPANY**

Jonathan L. Swichar (020721997)
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
Telephone:  973-424-2000
Fax:  973-424-2001
JLSwichar@duanemorris.com

Michael M. Mustokoff (*pro hac vice*)
Edward G. Biester (*pro hac vice*)
Robyn S. Stoter (011582009)
30 S. 17th Street
Philadelphia, PA 19103
Telephone: 215-979-1000
Fax: 215-754-4548
MMustokoff@duanmorris.com
EGBiester@duanemorris.com
RSStoter@duanemorris.com

Dated:  April 3, 2017

*Attorneys for Plaintiff Prime Aid Pharmacy
Corp.*

**TABLE OF CONTENTS**

Page

I.     BACKGROUND ................................................................................................1

II.    DEFENDANTS, ACTING THROUGH HPS AND HUMANA, EMPLOY
       PRETEXT TO PRECLUDE PRIME AID FROM THE HUMANA NETWORK ............12

III.   ANY WILLING PROVIDER ........................................................................14

IV.    JURISDICTION AND VENUE ....................................................................16

V.     PARTIES .......................................................................................................17

VI.    FACTUAL BACKGROUND .......................................................................18

       A.    Pharmacy Benefit Managers, Humana and HPS ................................. 18

       B.    Specialty Pharmacies and Prime Aid .................................................. 19

             1.    Specialty Pharmaceuticals ........................................................19

             2.    Specialty Pharmacies ................................................................20

             3.    Prime Aid ..................................................................................21

       C.    The Improper Termination of Prime Aid ............................................. 22

       D.    Prime Aid's Application to Join Humana's Network and Humana's Sham
             Excuses to Refuse Access .................................................................... 26

       E.    Humana's Arbitrary Five Year Exclusionary Period ........................... 27

VII.   DEFENDANTS' REJECTION OF PRIME AID'S APPLICATION VIOLATES
       NEW JERSEY'S ANY WILLING PROVIDER LAWS ..........................................28

VIII.  ADDITIONAL ALLEGATIONS REGARDING HUMANA'S
       MONOPOLIZATION ....................................................................................29

       A.    Relevant Market:  Market for Specialty Pharmacy Services for New Jersey
             Residents Locked In to the Humana Network ...................................... 32

             1.    New Jersey Patients Assigned to the Humana PBM Are
                   Locked In to the Use of Only Specialty Pharmacies in the
                   Humana Network ......................................................................33

                   a.    As the Exclusive PBM, Humana Limits Specialty
                         Pharmacies in its Network .............................................33

                   b.    There Are a Very Limited Number of Specialty Pharmacies
                         in New Jersey ................................................................34

                   c.    High Switching Costs ....................................................34

             2.    The Market for PBM Services is Dissociated with Patients'
                   Choice of Specialty Pharmacy Service Providers.....................37

i

a. Unilateral Changes Implemented by Humana to Locked-In Specialty Pharmacy Patients in New Jersey ...................................38

b. Humana's Exploitation of Locked-In Insureds Needing Specialty Pharmacy Services ........................................40

c. High Switching Costs and High Information Costs......................44

d. Humana's Dominant Share of the Market for Specialty Pharmacy Services for New Jersey Patients Locked In to the Humana PBM .........................................................47

e. Supracompetitve Pricing for Subcompetitive Service ..................48

B. Market or Monopoly Power: Humana Has the Power to Exclude Competition and Control Prices and Has Exercised that Power...........................49

C. Wrongful Conduct to Obtain or Maintain a Monopoly: Humana's Wrongful Exclusion of Its Key Local Competitor for Specialty Pharmacy Services for New Jersey Patients ..........................................53

D. Harm to Competition ....................................................56

1. Elimination of the Key Maverick Competitor Harms Competition........................................................56

2. Supracompetitive Prices and Subcompetitive Services .............................59

3. Restriction of Output.................................................61

4. Elimination of Consumer Choice.................................................62

E. Antitrust Injury...........................................................62

FIRST CAUSE OF ACTION:  DECLARATORY RELIEF (Preserved for Appeal) .................63

SECOND CAUSE OF ACTION: INJUNCTIVE RELIEF (Preserved for appeal).....................64

THIRD CAUSE OF ACTION: VIOLATION OF SECTION 2 OF THE SHERMAN ACT ...........................................................66

FOURTH CAUSE OF ACTION: VIOLATION OF NEW JERSEY ANTITRUST ACT ..........67

JURY DEMAND .................................................................69

I.      **BACKGROUND**

1.      This case is brought by Plaintiff Prime Aid Pharmacy Corp. ("Prime Aid"), a
specialty pharmacy located in Union City, New Jersey, harmed by the illegal conduct of
Defendants Humana Inc., which also operates under the assumed name Humana ("Humana"),
Humana Pharmacy Solutions, Inc. ("HPS"), Humana Health Plan, Inc. ("Humana Health"), and
Humana Insurance Company ("Humana Insurance") (collectively, "Defendants"), providers of
healthcare products and services.  Humana has one of the largest pharmacy benefit management
operations in the United States.  In addition, Humana also owns and operates its own mail order
pharmacy or pharmacies, collectively "Humana Pharmacy."  In November 2013, Humana
Pharmacy (RightSource Specialty Pharmacy) received URAC accreditation to operate a specialty
pharmacy.  Unlike Prime Aid, Humana Pharmacy has no physical presence in New Jersey and
fills all New Jersey prescriptions by mail order.

2.      The need for an in-state specialty pharmacy is especially acute in New Jersey.
Prime Aid has serviced thousands of specialty patients who reside in New Jersey.  Due to the
demographics of those most susceptible to diseases requiring specialty medication, many of
these very ill patients speak English only as a second language.  The appropriate dispensing of
medication for these drugs requires monitoring for compliance.  In some cases, interruptions in
treatment may have severe medical consequences.  The limitations of mail order dispensing are
not best suited to the needs of these patients.

3.      This Complaint presents a unique situation not previously addressed by the courts
of the State of New Jersey.

4.      Prime Aid brings this Complaint to address Humana's monopolization of a
captive market for specialty pharmacy services for New Jersey residents locked in to the Humana
PBM network.  Humana's wrongful exclusionary conduct has not only harmed Prime Aid.  It has

also harmed competition and consumer welfare.  The welfare of all patients locked into the Humana PBM is affected, including the locked-in patients referred to Prime Aid by physicians who have recognized the personalized care and supervision that Prime Aid conferred on their specialty patients suffering from severely compromised health often requiring self-injection and strict adherence to complex regimens.

5.       Those referring physicians and their patients have no choice in the selection of the patient's PBM.  That decision is made by each patient's employer and health plans selected by the employer.  In practice, the employers' choice of health plans and the employer or health plan's selection of an exclusive PBM is simply not focused on, and typically has no relationship to, any information regarding the quality of service provided by various pharmacies dispensing specialty drugs.

6.       While the inability and failure to focus on that information may not be particularly important in the dispensing of routinely managed medications, the quality of service provided by the specialty pharmacy is often critical to the treatment of specialty drug patients. Due to the cost of specialty medications and the PMB's role in the system, patients are locked in to a particular PBM by choices made by others.  Those choices are made without attention to specialty pharmacy service options or patient needs. The choice is made regardless of convenience, a patient's needs, or his or her physician's referral and recommendation.

7.       Specialty pharmacy patients cannot choose their PBM, cannot use a specialty pharmacy out-of-network and cannot switch PBMs or health plans upon the onset of need for specialty medications or in the middle of treatment.

8.       Specialty patients cannot go out of network due to the cost of specialty medications.   For example, Sovaldi lists for $84,000, and Harvoni for $94,500.

9.      Specialty patients cannot switch plans, except in narrow windows each year, and cannot switch to plans not offered by their employer because of the cost.

10.     Most importantly, specialty pharmacy patients cannot switch plans upon diagnosis or in mid-treatment for fear of loss of access to their treating physicians on their existing plans. Specialty patients are bound by whatever insurance coverage they have.  They quickly become irrevocably invested in such success they achieve in obtaining coverage approvals after their physician's prescription of specialty medication.  Patients further fear risks in attempting to switch after the huge investment required in co-pays and difficulties in obtaining co-pay assistance, a pre-prerequisite for treatment for many specialty patients.

11.     The Humana PBM has wrongfully forced patients out of their local New Jersey pharmacy and required them to submit to acceptance of mail order delivery by the PBM's own captive mail order pharmacy.  That conduct, and Humana's elimination of its key local specialty pharmacy competitor, harms the New Jersey specialty pharmacy patients locked in to the Humana PBM, and it is directly antithetical to the intent and purpose of the New Jersey Any Willing Provider Law.  The purpose and intent of that statute is to assure New Jersey residents – independent of their limited options of health plans – the personal choice and convenience of the pharmacy **they wish to select**.  That choice that is particularly important with specialty medications.  The law seeks to assure both patient access to their choice of pharmacy and pharmacies' and pharmacists' access to their patients.

12.     Humana, eyeing the profits it could make with its newly accredited mail order specialty pharmacy by terminating Prime Aid, the key local provider in New Jersey of specialty pharmacy services, set out intentionally and deliberately to monopolize a captive market for locked-in patients needing specialty medications.  Not only are the health consequences

3

significant, so are the economic consequences.  Specialty medications comprise a small

percentage of the number of prescriptions.  Due to their cost, however, specialty medications are

approaching 50% of all prescription dollars.  By dollars, they will surpass 50% of all drug

prescription costs in the near future.

13.     The result of the tactics employed by Humana has been harm to competition and

consumer welfare.  Humana has forced the vast majority of specialty pharmacy patients locked

in to its system to accept inferior mail order service.  At the same time, it has removed the one

local specialty pharmacy that was capable of accepting and was accepting and expanding the

increasing volume of specialty medications at the crucial time it was terminated.  In New Jersey,

Prime Aid alone possessed the resources and ability to challenge and overcome the devices

employed by the Humana PBM to limit output, in conjunction with manipulating prices so as to

maximize its own profit from rebates and otherwise.  Those devices include imposing delays and

denials in coverage, and hiding behind unachievable co-pays to limit expenses of the PBM and

plan to the detriment of the patient.  Prime Aid, by contrast, was willing and able to help patients

overcome delays and denials of coverage, find co-pay assistance, and commence and maintain

strict personalized treatment regimens.

14.     By eliminating its key local competitor for specialty pharmacy services at a

crucial time when specialty pharmacy medications came to market, Humana has: (a)

monopolized a captive market; (b) reduced levels of services below those that would prevail in a

competitive market; (c) increased the overall cost to patients and prices paid for inferior specialty

pharmacy services above competitive levels; and (d) prevented other pharmacies from

competing, inter alia, by manipulating pricing and pushing its own profits through volume

rebates from manufacturers.

15.     The ways in which PBMs and affiliated specialty pharmacies like those operated by Humana extract supracompetitive prices for subcompetitive services are complex and multifaceted as addressed further below and in the recent article, *The Hidden Monopolies That Raise Drug Prices:  How Pharmacy Benefit Managers Morphed from Processors to Predators*, March 28, 2017, attached as Exhibit "A".

16.     This Complaint asserts:

a.   New Jersey specialty drug patients have no voice in the selection of their PBM.

b.   An employer's choice of health plan and the employer or health plan's choice of PBM rarely, if ever, even considers the particular needs of specialty drug patients.

c.   Once a PBM has been selected, it alone has the power to limit the choice of its patient participants to a pharmacy that it – and not they – select.  PBMs can and do make such determinations without giving weight to either the needs of the patient or the clinical choice of that patient's physician.

d.   Specialty pharmacy patients locked in to the Humana PBM cannot go out of network or switch plans upon diagnosis or mid-treatment.

17.     The Humana PBM's deliberate wrongful conduct to obtain and maintain a monopoly in a captive market of locked in specialty pharmacy patients violates the New Jersey Antitrust Act, Section 2 of the Sherman Act, and New Jersey's Any Willing Provider laws.

18.     Set forth further below are further details of:  (a) the wrongful exclusionary conduct of Humana; (b) the lock-in of specialty pharmacy patients; (c) the inability of those patients to switch plans, PBMs or specialty pharmacies; (d) dissociation of the patient's and physician's choice of specialty pharmacy from their employer's choice of PBM; (e) the Humana

Pharmacy's dominant share of the captive market for specialty pharmacy services; (f) harm to competition and consumer welfare; and (g) antitrust injury.

19.     The standing to sue under the AWP law itself is a matter that has not yet been addressed by the courts of the State of New Jersey.

20.     Whether or not a private cause of action is allowed under the AWP, the AWP was enacted so that a patient in New Jersey would not be forced to accept a pharmacist or pharmacy based on choices made by the decisions of others in determination of health plans or PBMs, nor would New Jersey residents be forced to accept mail order pharmacy services.

21.     Humana's monopolization of a captive market of locked in specialty pharmacy patients, in contravention of the competition and consumer choice mandated by the AWP, harms competition and consumer welfare.  Humana's conduct has caused antitrust injury to both Prime Aid and the patients locked in to the Humana PBM.

22.     In violation of New Jersey's Any Willing Provider law and the antitrust laws of both the United States and New Jersey, Defendants have acted with anticompetitive intent and with total disregard for the health and welfare of patients in New Jersey.  They have ousted Prime Aid from the Humana provider network (the "Humana Network"), absent the required due process.

23.     Defendants have sought to exclude Prime Aid from the Humana Network knowing that Prime Aid extends services to New Jersey residents that cannot be provided by mail order.  Prime Aid has demonstrated that it is able to fully comply with all terms and conditions to be a participant in the Humana Network.

24.     Defendants' efforts to exclude Prime Aid from the Humana Network are motivated by their desire to drive Prime Aid's patients to Humana's own specialty pharmacy,

6

Humana Pharmacy, by exploiting their control over Pharmacy Benefits Manager ("PBM")
services in the Humana Network. This policy of Humana to drive monopoly profits into its
Humana Pharmacy is undertaken with the specific intent to monopolize the market for specialty
pharmacy services to New Jersey residents locked into their use of Humana's HPS PBM
services.

      25.     If not stopped, Defendants' wrongful conduct will likely monopolize Humana's
captive market for specialty pharmacy services, to the extent Humana has not already wrongfully
achieved a monopoly. It is not just Prime Aid, but healthy competition and the welfare of
severely compromised patients that are being harmed by Defendants' anticompetitive scheme.

      26.     Defendants have abused the exclusive dealing arrangements they have with health
plans and employers doing business in New Jersey by excluding Prime Aid from access to New
Jersey patients requiring specialty pharmacy services.

      27.     With its market power and absolute ability to exclude competition within the
relevant market for specialty pharmacy services for patients locked into its PBM, Humana and
HPS have mounted a campaign to eliminate competition from independent specialty pharmacies
like Prime Aid that threaten their monopoly.

      28.     Defendants' anticompetitive behavior is not limited to Prime Aid in New Jersey.
On information and belief, Defendants are deploying a similar strategy to monopolize specialty
pharmacy services in the Humana Network at the expense of patients who are locked into that
Network as well as other independent specialty pharmacies like Prime Aid.

      29.     Defendants' exclusionary conduct is not unique to Prime Aid. As attorney David
A. Balto testified before the Regulatory Reform, Commercial and Antitrust Law Subcommittee
of the House Judiciary Committee on November 17, 2015:

PBMs increasingly engage in anticompetitive, deceptive or egregious conduct that harms consumers, health plans, and pharmacies alike. In a nutshell, both consumers and pharmacies suffer as consumers are increasingly denied a choice in their level of pharmacy service by PBMs. PBMs exercise their power to restrict consumers to the PBM's own captive mail order and specialty pharmacy operations, reducing choice and quality for many.

. . .

This is especially true for specialty pharmacies. Specialty pharmacies manage the highly-expensive and very complex treatments for the most intricate and serious illnesses. The service they provide is both distinct and significant from other retail pharmacies. Beyond merely dispensing drugs, specialty pharmacies help administer complex treatments, assist physicians in monitoring patient therapy, and play an important role in medication compliance and improved health outcomes. Specialty pharmacies educate patients on effective utilization, monitor side effects, and partner with physicians to identify ineffective medications and recommend treatment changes. Specialty pharmacies play an active role in providing continuity of patient care to ensure that costs are minimized and health outcomes improve. And there is clear evidence that patients needing specialty medications have better health outcomes when they have the services of a community pharmacy rather than being forced into a PBM-owned mail order operation.

. . .

More recently, PBMs are finding new revenue sources through egregious conduct. Some PBMs are using audits not just as a means of supposedly combating fraud but rather as a mechanism to secure greater revenue. PBMs engage in a variety of audit tactics such as "extrapolating" errors to inflate recoveries. Some PBMs rely on unfair and technical errors to withhold substantial funds from providers despite evidence that patients properly received dispensed medications.

30.     It bears emphasizing that patients needing specialty medications have better

health outcomes when they have access to the services of a local specialty pharmacy rather than

being forced into a PBM-owned mail order operation, as caused by Humana's wrongful conduct

in eliminating competition from Prime Aid and securing its monopoly for specialty pharmacy services over the captive market for those services for locked-in New Jersey patients.

31.    By way of example, as described in *The Hidden Monopolies that Raise Drug Prices:  How Pharmacy Benefit Managers Morphed from Processors to Predators*, Exhibit "A" at pages 10-11:

> Though PBMs challenge pharmacies to maintain customer compliance with prescription drugs, steering customers to mail-order pharmacies where they get no direction or personal contact can produce the opposite result.   A 2013 study on patient adherence found that "personal contact with a pharmacy or pharmacy staff" was one of the most important variables for taking medications.

32.    Prime Aid has operated a specialty pharmacy in New Jersey since 2006.  It boasts a well-deserved reputation for providing extraordinary service.  As a result, it has secured the confidence and trust of prescribing physicians and clinics, as well as the underserved and critically ill patients who require the guidance and support it provides.

33.    Prime Aid started as a store front pharmacy striving to provide superior service to a limited number of patients.  It has since developed into a substantial competitor for the specialty pharmacy services offered through PBM-affiliated mail order pharmacies.  Depending on a group of in-house pharmacists and nurses, Prime Aid meets the demands of the physicians and patients it serves in both the administration of the drugs and monitoring symptoms and compliance.

34.    Taking note of Prime Aid's growth in patient accounts, Defendants have now engaged in wrongful conduct to use their market power to extinguish Prime Aid as a competitor in order to build and establish a monopoly over specialty pharmacy services for locked in New Jersey residents.

35.     Due to the quality of personalized care provided by Prime Aid, many physicians have specifically referred patients requiring specialty medications to Prime Aid.

36.     In filling tens of thousands of specialty drug prescriptions, Prime Aid has distinguished itself in New Jersey.  Its nurses regularly visit patient homes to assist patients in the initiation of treatment.  Prime Aid's staff is multilingual, providing assistance to patients in Spanish, Russian, Vietnamese and Chinese dialects and other languages in order to make certain that patients understand the details of administration of the medications as well as the monitoring of symptoms.

37.     Through its superior service, Prime Aid has established working and referral relationships with many of the premier hospitals and medical practices in New Jersey.  These relationships are now jeopardized by Defendants' exclusion from the Humana Network. Employing pretextual reasons for denial, Humana's HPS refuses to allow a substantial and increasing percentage of its patients who are locked into its provider network from using the services of Prime Aid in in order to push monopoly profits to Humana' own specialty pharmacy.

38.     It is only now that Prime Aid has grown its business, and Humana in November 2013 received URAC accreditation for its own in-house specialty pharmacy with a capability of supplying via mail order specialty drugs, that Prime Aid's ability to provide personalized services to physicians and patients has become an impediment to Defendants' drive to monopolize the market for specialty pharmacy services for New Jersey residents locked in to the Humana Network.

39.     Mergers, acquisitions and consolidation among PBMs have concentrated a substantial market power in the hands of a limited number of PBMs.  The abuse of that market power has become acute in markets for specialty pharmacy services.  Specialty pharmacy

services are the fastest growing segment of pharmaceutical sales and account for hundreds of millions of dollars in sales and a fast-growing, significant percentage of profits of Humana.

40.     In flagrant violation of New Jersey's Any Willing Provider laws, Defendants have ignored the needs of prescribing physicians and the requirements of patients in order to drive the lucrative specialty pharmacy business to Humana Pharmacy, Defendants' captive mail order specialty pharmacy.  This conduct adversely affects the level of service and quality of care available to patients in great need, and does so at the risk of tragic consequences.  By excluding the most significant local service providers like Prime Aid and driving patients to their captive mail order pharmacy, Defendants are able to exclude competition, reduce output and increase prices and lower service levels in the relevant market.

41.     Patients requiring specialty pharmacy services are locked into specialty pharmacy services in network, inter alia, because the costs of going out-of-network are prohibitive for these expensive medications.  For example, a prescription for Hepatitis C medications, Harvoni and Sovaldi, may cost as much as $29,000 a month over a number of consecutive months.

42.     Specialty drugs are not just particularly expensive.  They require attention in their storage and shipment.

43.     Specialty patients often require personal assistance in self-injection and therapeutic compliance, at a level unavailable by mail order.

44.     Efforts by several PBMs to force HIV patients to use captive mail order pharmacies have recently been challenged in the courts and abandoned by the PBMs.  In New Jersey, the Any Willing Provider law prohibits such conduct, including the conduct by Defendants.

45.     The Any Willing Provider law addresses the problem of the locked-in patient and resolves it by allowing patient choice and pharmacy access.  It requires competition that allows the market to set a competitive level of service.  To extract monopoly profits, Defendants preempt the competition mandated by the Any Willing Provider law, and impose a level of service (mail order) which that law dictates is not sufficient to meet the needs of patients.

## II.     DEFENDANTS, ACTING THROUGH HPS AND HUMANA, EMPLOY PRETEXT TO PRECLUDE PRIME AID FROM THE HUMANA NETWORK

46.     Prime Aid had operated successfully in the Humana network until the events that led to its wrongful termination by Humana in 2014.  In November 2013, Humana Pharmacy (specifically, mail order RightSource Specialty Pharmacy) received accreditation as a specialty pharmacy from URAC.  From that point, Humana looked for pretexts to oust Prime Aid from its network, so that it could exploit a locked-in market for specialty pharmacy services needed by patients assigned to its PBM.  It has employed such pretexts to remove and preclude Prime Aid from its network, based on the competitive threat Prime Aid posed to Humana's plans to monopolize a market for locked-in specialty pharmacy patients.

47.     On information and belief, Humana oversees a process through which providers are admitted into and allowed to remain in the Humana Network and manipulates that process for its own interests, including steering specialty pharmacy services to its captive Humana Pharmacy.  Humana promulgates form contracts with providers like Prime Aid which ambiguously define the contracting parties as "Humana Health Plan, Inc. (a health maintenance organization) and Humana Insurance Company (an insurance company) and their affiliates who underwrite and/or administer health plans (hereinafter 'Humana')".  Humana is an assumed name of Humana, Inc., which executes these contracts under the name Humana.  Humana, Inc., also known as Humana, was actively involved in contracting with, terminating and refusing to

12

readmit Prime Aid to the Humana Network.  The true reason why Prime Aid was excluded from the Humana Network was that it posed a significant threat to Humana's efforts to monopolize the market for specialty pharmacy services for locked-in New Jersey residents.

48.     In 2014, Defendants improperly terminated Prime Aid from the Humana Network.  In April 2015, Prime Aid submitted an application to Humana to join Humana's Network.  On May 7, 2015, Defendants, through Humana and HPS notified Prime Aid that Prime Aid's application was denied.  In its denial of Prime Aid's application and Defendants' refusal to reconsider its denial, Defendants refused to acknowledge the fact that Prime Aid was willing and able to meet the terms and conditions set forth for providers to be a member of the Humana Network.

49.     Instead, Defendants relied on an alleged policy that a pharmacy terminated for cause could not reapply to join the Humana Network for a minimum of five (5) years after being terminated from the Humana Network.  Defendants' claim regarding a mandatory policy of excluding providers for a "minimum" of five (5) years is false.  The document upon which they rely – their standard Pharmacy Provider Agreement – specifically says that Defendants maintain "discretion" to decide at what point in time a pharmacy is eligible to reapply to be a member of the Humana Network.  By denying Prime Aid's application, all Defendants also fail to comply with New Jersey's Any Willing Provider law.

50.     At all times, Prime Aid has been and remains ready, willing and able to meet the terms and conditions for participation in the Humana Network.

13

III.     **ANY WILLING PROVIDER**

51.    New Jersey's Any Willing Provider law requires that health plans and PBMs admit any provider, including a specialty pharmacy such as Prime Aid, into their networks, if the provider is willing to meet the terms and conditions the insurer or PBM requires of its network providers.

52.    As addressed below, Defendants' summary denial of Prime Aid's application to the Humana Network fails to set forth the factors upon which the decision was based as required by the Any Willing Provider law.  The summary denial and Defendants' "mandatory" five (5) year ban from being a member of the Humana Network are simply a cover for Defendants' anticompetitive goal to eliminate Prime Aid as a ready, willing and able competitor.

53.    Defendants' efforts to bar Prime Aid from the Humana Network is designed to steer patients who would otherwise utilize Prime Aid for their medications and their administration to its other affiliated pharmacies and to its own specialty pharmacy, Humana Pharmacy, thereby enabling Defendants to monopolize the market for patients requiring specialty medications who are locked into the Humana Network.

54.    Defendants' motivation to eliminate Prime Aid as a competitor in the State of New Jersey is easily identified.  As the most prominent specialty pharmacy in the State of New Jersey, Prime Aid is able to fill specialty medications for the majority of individuals who are locked into HPS' PBM services.  By eliminating Prime Aid as a source of medications for specialty patients residing in New Jersey, Humana and HPS are able to direct insureds, including insureds of Humana Health and Humana Insurance to Humana Pharmacy.  Once these insureds are steered to Humana Pharmacy, Defendants will collectively decide whether to authorize the filling of a prescription for such individuals.

14

55.      It is well known in the insurance industry that insurance companies and their affiliated PBMs consider the costs and profit margins in deciding whether to authorize the fill of a medication.  In the context of specialty medications, PBMs, such as HPS, will analyze the profit to be generated in authorizing a fill of a medication versus the revenue which will be generated from the insurance companies for controlling costs as a result of the denial in filling such medications.

56.      Certain of the specialty medications routinely filled for Prime Aid's specialty patients, such as medications for Hepatitis C, will, on average, cost the insurance company approximately $30,000 per month.  Despite the significant cost of these medications, the profit margins for them are extremely low.  PBMs, such as HPS, as a matter of course, will deny requests from independent pharmacies to fill medications for specialty patients who have been prescribed these medications by their physicians.  When an independent pharmacy, such as Prime Aid, receives notice that the PBM, such as HPS, will not authorize the dispensing of a costly specialty medication, Prime Aid assists the patient in an internal appeal of that decision and, if necessary, an external appeal.

57.      Independent pharmacies, like Prime Aid, are generally successful in appealing the PBM's initial decision to deny the medication, as Prime Aid will only seek approval to fill a medication where the prescription and patient's medical history necessitate the patient taking the medication.  When patients are forced to use a pharmacy affiliated with a PBM, such as Humana Pharmacy, the affiliated pharmacy, unlike the independent pharmacy, has no incentive to engage in any efforts to assist the patient in appealing a decision to deny medications to patients, threatening the welfare of such patients.  By denying approval for these medications, and engaging in no efforts to appeal that decision, HPS, Humana and Humana Pharmacy are able to

15

save millions of dollars for Humana Health and Humana Insurance.  Only when the drug

presents the possibility of a meaningful profit margin do Defendants then allow Humana

Pharmacy to fill medications for the patients steered away from specialty pharmacies, such as

Prime Aid.

59.     Prime Aid seeks a declaratory judgment that the denial of Prime Aid's application

violates New Jersey's Any Willing Provider laws and an order requiring that Humana and HPS

process Prime Aid's application for inclusion into the Humana Network in accordance with such

laws.  Prime Aid also seeks compensatory damages and treble damages, injunctive relief, costs

and attorneys' fees for violations of the antitrust laws of the United States and New Jersey.

**IV.      JURISDICTION AND VENUE**

59.     Plaintiff's claims against Defendants include claims arising under the federal

antitrust laws, including Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and

Section 2 of the Sherman Act, 15 U.S.C. § 2.  This Court has subject matter jurisdiction over this

matter pursuant to 28 U.S.C. § 1331 and § 1337 because one or more claims arise under the laws

of the United States and the antitrust laws, in particular, and pursuant to 28 U.S.C. § 1332, as the

parties are citizens of different states and the amount in controversy exceeds $75,000.

60.     This Court further has subject matter jurisdiction over Plaintiff's claims arising

under state law pursuant to 28 U.S.C. § 1367, because those claims are related to the claims that

arise under federal law and form part of the same case or controversy.

61.     This Court has personal jurisdiction over Defendants as they conduct substantial

business in New Jersey, which has a significant impact upon the residents of New Jersey.

62.     Venue is proper in this District under 28 U.S.C. §§ 15(a) and 22, and 28 U.S.C.

§ 1391, as a substantial part of the events giving rise to this action occurred in New Jersey and

because Defendants are subject to personal jurisdiction in New Jersey.

## V.    **PARTIES**

63.    Plaintiff Prime Aid Pharmacy Corp. is a New Jersey corporation with its principal place of business at 3915 Bergenline Avenue, Union City, New Jersey.  Prime Aid is the most prominent independent specialty pharmacy in New Jersey.  On information and belief, it is one of only a few specialty pharmacies that has a physical presence in the entire state.  It presently services thousands of patients with acute chronic conditions. It annually fills tens of thousands of medications for New Jersey residents.

64.    Prime Aid services patients with staff speaking at least seven different languages and has working relationships with most of the premier hospitals and healthcare providers in New Jersey.  Prime Aid is currently licensed in approximately forty (40) states (including New Jersey), although the vast majority of its business is local to New Jersey.  It is a New Jersey Medicaid provider and is certified by the two most widely recognized evaluators of health care delivery, URAC and JCAHO.

65.    Defendant Humana, Inc. ("Humana") is a Delaware corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky, which has also adopted the assumed named "Humana" under Kentucky law.  Humana offers a range of insurance products and services.  Humana owns and controls numerous entities, including a captive specialty pharmacy which provides services to New Jersey residents through mail order.

66.    Defendant Humana Pharmacy Solutions, Inc. ("HPS") is a Kentucky corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky 40202.  It is a subsidiary of Humana.  As a PBM, HPS processes and administers the payment of health insurance claims submitted to insurers or self-insured employers by health care providers, such as specialty pharmacies like Prime Aid, for medical care that the provider has provided to an insured.

67.     Defendant Humana Health Plan Inc. ("Humana Health") is a Kentucky corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky 40202.  It is a subsidiary of Humana.  Humana Health is a health maintenance organization ("HMO").  It offers health plans to residents of New Jersey.  As an HMO, Humana Health requires that plan participants utilize specific medication providers, including pharmacies, that contract with Humana Health.

68.     Defendant Humana Insurance Company ("Humana Insurance") is, on information and belief, a Wisconsin corporation with its principal place of business at P.O. Box 740036, Louisville, Kentucky 40202.  On information and belief, Humana Insurance offers insurance plans to residents of New Jersey.

## VI.   FACTUAL BACKGROUND

### A.   Pharmacy Benefit Managers, Humana and HPS

69.     The pharmaceutical industry involves patients, physicians who write prescriptions, pharmacies that dispense medications, health insurance plans, drug manufacturers, and PBMs.

70.     PBMs are agents who manage an insurance company, health plan or self-insured employer's prescription drug program.  PBMs process and make payments on claims submitted to them for prescription medications which are then dispensed by a pharmacy to a patient.  PBMs also administer the pharmacy benefits for insurance companies, negotiate medication pricing with drug manufacturers and decide which medications and what form of the medication are covered under the various plans that an insurance company provides.

71.     HPS is among the largest PBMs in the United States and New Jersey.  HPS' size and scope is likely to increase going forward, particularly in light of consolidation among PBM's and insurers.

18

72.     In addition to controlling HPS as a PBM, which involves processing and making payments on claims, Humana also controls and operates its own pharmacies, collectively Humana Pharmacy.  Humana Pharmacy provides mail order and specialty pharmacy medications.  Humana Pharmacy operates one of the largest specialty pharmacies in the United States.  Humana's specialty pharmacy controls the specialty pharmacy business within the Humana Network, much of that concentrated in providing captive services to patients who are locked into their use of Humana's PBM, HPS, through their group insurance plans.

73.     Every claim submitted by independent pharmacies to HPS for processing is a claim that Humana Pharmacy might otherwise process.  The revenues and profits received by an independent specialty pharmacy might otherwise be received by Humana through Humana Pharmacy.  Specialty pharmacy revenues are particularly significant because of the high cost of specialty medications.  On information and belief, specialty pharmacy represents hundreds of millions of dollars in revenue for Humana each year and is among the fastest growing segments of revenues for Humana.  By excluding willing specialty pharmacies like Prime Aid from the Humana Network, Defendants are able to drive Prime Aid's specialty medication patients and the revenues their prescriptions generate to their own captive pharmacy.

    **B.**    **Specialty Pharmacies and Prime Aid**

        **1.**    **Specialty Pharmaceuticals**

74.     Medications designated as "specialty pharmaceuticals" require special treatment for a host of reasons.  Typically not available through retail pharmacies, these medications are used in the treatment of complex, chronic conditions, such as HIV, Hepatitis C, rheumatoid arthritis and organ transplants.  They are much more expensive than traditional pharmaceuticals and they require special handling and care in distribution and administration.  Patients require monitoring for compliance and education for proper treatment.

19

75.     Many specialty medications are derived from plasma-based proteins, which make them unstable.  They require extensive care in handling in order to ensure sterility, safety and stability.  They often need to be stored and shipped at a certain temperature and in special containers.

76.     Many specialty pharmaceuticals require injections or infusion.  Often patients are called upon to perform injections themselves.  Training is often required.  Improper administration or monitoring of symptoms can lead to severe side effects and interfere with the efficacy of critical and expensive treatment regimens.

## 2.     Specialty Pharmacies

77.     Specialty pharmacies dispense specialty pharmaceuticals.

78.     Some states, including New York, expressly require by law or regulation that the specialty pharmacies have a brick and mortar presence in the state so as to facilitate the demands of special care and attention required in dispensing these expensive medications for severe medical conditions.  Many of the specialty drugs spoil quickly.  Many require special regimens for administration, including injections that many patients have difficulty performing themselves.  Because New Jersey does not expressly mandate brick and mortar presence for specialty pharmacies, almost no specialty pharmacies operate and provide personal services in the State.

79.     Specialty pharmaceuticals are expensive, thus raising a host of issues of payment, reimbursement and cash flow.  Even if a drug is covered under a health plan, co-payments and deductibles create significant issues for both the patient and the dispensing pharmacy.  Specialty pharmacies bear significant costs in closely managing an inventory which is particularly expensive and prone to spoiling, while providing needed services to patients in seeking waivers and manufacturer funding of co-pays and deductibles.

80.     Specialty pharmacies provide clinical support.  This support includes providing licensed pharmacists and nurses who assist patients with proper administration.  They answer questions that inevitably arise in the administration of specially pharmaceuticals.  Clinical support also includes patient education and counseling.

81.     Beyond education and counseling, specialty pharmacies engage the patient to monitor patient compliance with the treatment regimen, including timing, dosage and symptoms.

### 3.     <u>Prime Aid</u>

82.     On information and belief, there are less than five (5) specialty pharmacies located in New Jersey.  Of these, Prime Aid is the largest in terms of patients and prescriptions. It is the only specialty pharmacy in New Jersey with the resources to deliver specialty medications and support doctors and patients across the entire state.

83.     Prime Aid provides extraordinary service in helping doctors and patients communicate and coordinate as needed to address the special needs for administration of these medications.

84.     Prime Aid's ability to track patient needs and compliance using its proprietary software programs and local presence was demonstrated when it made certain that drug deliveries were made ahead of the blizzard that struck the state the weekend of January 23-24, 2016.

85.     Local presence was also critical when Hurricane Sandy struck New Jersey.  When the hurricane disrupted communication, transportation and medical shipments in New Jersey, Prime Aid employees made deliveries on bicycle and other means and provided the support needed for proper administration of the specialty drugs.

86.     Physicians and clinics prefer to deal with Prime Aid over mail order specialty pharmacies due to the extraordinary demands in the delivery and administration of specialty

21

drugs as well as Prime Aid's proven ability to provide effective specialty pharmacy services in New Jersey.

87.     Humana Pharmacy does not have any locations in New Jersey.  To the extent that Humana Pharmacy is filling medications for New Jersey residents, it is required to do so by mail. The inability to properly service patients requiring specialty drugs via mail order is well known in the health insurance industry, and to Humana.

88.     On information and belief, Prime Aid is the only specialty pharmacy in New Jersey which maintains the resources to provide multilingual management of specialty patient needs.

89.     Prime Aid employs approximately fifty (50) New Jersey residents, including pharmacists and nurses whose livelihood depends upon employment with Prime Aid, which, in turn, depends upon revenue generated by filling medications for residents of New Jersey.

90.     Due to compromised health of its specialty patients, Prime Aid's physical presence in the State presents a great convenience in emergency situations.

C.     **The Improper Termination of Prime Aid**

91.     Defendants had no valid basis to terminate Prime Aid.  The reasons stated by Defendants for terminating Prime Aid were pretext.  The actual reason why Defendants terminated Prime Aid was that they had recently obtained accreditation for an in-house mail order specialty pharmacy and Prime Aid stood in the way of Defendants plans to monopolize specialty pharmacy services for a captive market for specialty pharmacy patients locked in to the Humana Network.

92.     On April 4, 2014, Defendants through Humana and HPS notified Prime Aid that they were terminating Prime Aid from the Humana Network, alleging generally that Prime Aid violated Humana's terms and conditions by sending medications to patients in states in which

22

Prime Aid, at the time, was not licensed (Florida and Ohio).  Humana's notice to Prime Aid did not comply with New Jersey law, which required that specific details regarding the patients, medications, claims and dates involved, be provided.  A copy of the April 4, 2014 letter is attached hereto as Exhibit "B".

93.    On April 17, 2014, Prime Aid responded and refuted its general allegations with detail.  A copy of Prime Aid's April 17, 2014 letter is attached hereto as Exhibit "C".  Prime Aid specifically denied that shipments into Florida and Ohio constituted a breach of the Pharmacy Provider Agreement ("Provider Agreement").  On the contrary, applicable state and federal laws trumped any provisions in the Provider Agreement that would be in violation of such laws.  As explained in the April 17 letter, the laws of Florida and Ohio required that Prime Aid ensure that its patients' therapeutic regimens not be interrupted while patients may have been located in either of these states.

94.    On April 28, 2014, Defendants through Humana and HPS provided additional details regarding the patients, medications, claims and dates in question.  A copy of the April 28, 2014 email is attached hereto as Exhibit "D".

95.    On May 12, 2014, Prime Aid responded in greater detail to Defendants' allegations.  A copy of Prime Aid's May 12, 2014 letter is attached hereto as Exhibit "E".

96.    On June 19, 2014, Defendants through Humana and HPS responded to Prime Aid's explanation and refused to accept Prime Aid's explanation regarding the medications in question and also refused to honor Prime Aid's request for a hearing, in violation of New Jersey law.  A copy of the June 19, 2014 letter is attached hereto as Exhibit "F".

97.    On August 6, 2014, Prime Aid again requested that Defendants provide it with a hearing, as mandated by New Jersey law, and again reiterated, as detailed below, that Prime Aid

had sent medications via mail delivery to pre-existing Prime Aid patients in order to comply with applicable law.  Defendants ignored both Prime Aid's request and explanations.  A copy of Prime Aid's August 6, 2014 letter is attached hereto as Exhibit "G".

98.     Contrary to Defendants' assertion, Prime Aid's shipment of medications to Prime Aid patients in Florida and Ohio was in accordance with state laws and did not allow for termination from Humana's Network.

99.     Florida law states that "[a] patient has a right to treatment for any emergency medical condition that will deteriorate from failure to provide such treatment."  Fla. Stat. § 381.026.  Similarly, New Jersey defines "unprofessional conduct" as "gross negligence, gross malpractice, or gross incompetence which damaged or endangered the life, health, welfare, safety or property of any person."  N.J.A.C. § 45:1-21(c).  Both states also permit pharmacies to dispense medications on an emergency basis for continuation of a therapy for chronic conditions or chronic maintenance drugs.  *See* N.J.A.C. § 3:39-7.4 and Fla. Stat. § 465.0275.  Ohio does not have laws prohibiting the out-of-state delivery of medications in which a patient is temporarily out-of-state and requires a short term refill to avoid the endangerment of their health due to the interruption in therapy.

100.     The patients to whom Prime Aid sent medication in Florida were existing Prime Aid patients suffering from chronic and serious conditions who travelled to Florida for short periods of time.  Both patients requested that Prime Aid send their medications to them while they were in Florida.

101.     Prime Aid's dispensing of medication to those patients was in accordance with Florida and New Jersey law, and its failure to dispense the prescribed medications to those

24

patients while the patients were in Florida would have constituted violations of Florida and/or New Jersey laws, including the aforementioned laws.

102.    The patients to whom Prime Aid sent medication in Ohio were also existing Prime Aid patients who were prescribed specialty medications and who suffered from chronic conditions.  The medications that were sent to the patients were specialty medications, and if the patients' treatment were interrupted, the consequences for the patient may have been catastrophic or fatal.

103.    Prime Aid's dispensing of medication to those patients in Ohio was in accordance with New Jersey and Ohio law, and its failure to dispense the prescribed medications to those patients while the patients were in Ohio would have constituted violations of New Jersey and/or Ohio law, including the aforementioned laws.

104.    Humana's own Agreement with its providers states that Humana shall comply "with all federal, state, local and CMS instructions, statutes, ordinances, orders, rules and regulations that are applicable to the provision of Pharmacy Services under terms and conditions to this Agreement."

105.    In its April 4, 2014 letter, Defendants through Humana and HPS also indicated that they were terminating Prime Aid because their standard form Provider Agreement excluded mail order pharmacies.

106.    Contrary to Defendants' assertions, Prime Aid is not a mail order pharmacy. Prime Aid is not licensed as a mail order pharmacy in New Jersey.  Defendants' termination of Prime Aid from its Network was without cause and simply an unlawful attempt to eliminate competition in the State of New Jersey.

107.     New Jersey, unlike New York, does not require in-state brick-and-mortar

presence for specialty pharmacies.  Defendants wrongfully terminated Prime Aid as part of their

plan to monopolize a captive market for specialty pharmacy services for locked-in customers,

just as a wave of revolutionary and expensive specialty medications was hitting the market.  The

stated reasons for the termination are a sham and a pretext for monopolization.

**D.     Prime Aid's Application to Join Humana's Network and Humana's Sham Excuses to Refuse Access**

108.     More than one (1) year after being terminated from the Humana Network, Prime

Aid, in April 2015, submitted an application and all required supporting documentation to

Humana necessary for re-admittance to the Humana Network.

109.     While HPS is Humana's PBM, Humana is involved in the process of securing and

evaluating applications from providers seeking to become a member of the Humana Network.

Humana Inc. has registered with the Commonwealth of Kentucky the name "Humana" as an

assumed name.  See Exhibit "H".  In order for Prime Aid to obtain an application to join the

Humana Network, it was required to obtain it from www.humana.com – the web page

maintained by Humana.

110.     The application obtained by Prime Aid is titled "Pharmacy Contract Request

form."  See Exhibit "I".  The application form provided by Humana to Prime Aid specifically

identifies Humana's assumed name on each page.  Additionally, it requests at the bottom of page

2 that Prime Aid complete and return the form to a fax number or email address maintained by

Humana.  Further, Humana's web page provides that if healthcare providers have questions on

enrollment to contact "Humana Inc."

111.     On May 7, 2015, Defendants through Humana and HPS responded to Prime Aid's

application, denying it.  A copy of the May 7, 2015 response is attached hereto as Exhibit "J".

112.    In its response, Defendants claimed that Prime Aid will not be "eligible to reapply for a Humana contract" until five (5) years passes from date the pharmacy was terminated.

113.    By letters dated May 14, 2015 and June 11, 2015, Prime Aid expressed its opposition to Defendants' denial, identifying that Humana's five (5) year exclusionary period was far outside the industry standard of one (1) year and that the five (5) year exclusionary period violates the letter and spirit of New Jersey's Any Willing Provider statutes, N.J.S.A. §26:2J-4.7(a)(2).  Prime Aid also reiterated that there was no appropriate legal or factual basis for Defendants to have terminated Prime Aid for cause in 2014.  A copy of Prime Aid's May 14, 2015 letter is attached hereto as Exhibit "K", and a copy of Prime Aid's June 11, 2015 letter is attached hereto as Exhibit "L".

114.    Defendants responded on May 28, 2015, again claiming that Prime Aid had been terminated from Humana's Network for cause, that one of the "term[s] and condition[s] applicable to pharmacies contracting with Humana" is that a pharmacy "terminated for cause may not be eligible for reapplication for a minimum of five years."  A copy of the May 28, 2015 letter is attached hereto as Exhibit "M".

### E.    **Humana's Arbitrary Five Year Exclusionary Period**

115.    On information and belief, shortly before the termination of Prime Aid, Humana unilaterally added a provision to its contracts of adhesion with pharmacies purporting to allow Humana, at its discretion, to keep terminated pharmacies out of its network for five years. Humana unilaterally adopted this change as part of an anticompetitive scheme to create artificial barriers to entry and prevent competition with its in-house pharmacies within its network.

116.    As Prime Aid cited in its correspondence with Defendants, the industry standard for excluding a pharmacy from a PBM network after the PBM terminates the pharmacy for cause is one (1) year.

27

117.    Defendants have provided no legal basis for a protracted exclusionary period of five (5) years.

118.    Defendants' five (5) year exclusionary period violates the spirit and letter of New Jersey's Any Willing Provider law.

119.    By claiming that Humana's policy that a pharmacy terminated for cause from its Network must wait five (5) years before reapplying to its Network is a "term and condition applicable to pharmacies contracting with Humana," Humana and the other defendants are attempting to evade New Jersey's Any Willing Provider law.

120.    Additionally, Defendants' claim that they are "required" to exclude Prime Aid for a period of five (5) years is contradicted by its standard provider agreement.  In point of fact, the standard provider agreement provides that a terminated provider "may not be eligible for reapplication for a minimum of five (5) years per Humana's discretion."  (emphasis added).

## VII.    DEFENDANTS' REJECTION OF PRIME AID'S APPLICATION VIOLATES NEW JERSEY'S ANY WILLING PROVIDER LAWS

121.    As required by New Jersey's Any Willing Provider laws, any pharmacy which agrees to the terms and conditions set forth by any insurer, hospital service corporation, medical service corporation, health service corporation, or health maintenance organization shall not be denied the right to participate as a preferred provider or as a contract provider.  See N.J. P.L 1999, ch. 359, approved Jan. 18, 2000, N.J. Stat.§ 17:48-6j; 17:48A-7i; 17:48E-35.7; 17B:26-2.1i; 17B:27-46.1; 26:2J-4.7.  Under these same laws, no patient in New Jersey can be required to obtain pharmacy services and prescription drugs from a mail service pharmacy.  E.g., N.J. Stat. § 17:26-2.1i (a)(4)(a).

122.    Prime Aid has, at all relevant times, been ready, willing and able to meet the terms and conditions that Defendants apply to be a member of the Humana Network.

123.    Prime Aid, in its appeal of Defendants' decision to terminate Prime Aid and in its application to join Humana's Network, has demonstrated that Defendants' rejection of Prime Aid is without any factual or legal basis.

124.    Prime Aid's provision of specialty medications to existing Prime Aid patients who suffered from chronic and serious illnesses and who had traveled to other states was in compliance with applicable laws, not in contravention of those laws.  Prime Aid's failure to provide continuing care to those patients would have been in contravention of those laws and would have likely had disastrous consequences.

125.    Prime Aid was not a mail order pharmacy and Defendants cannot construe Prime Aid's provision of specialty medications to Prime Aid's patients who are in desperate need of specialty medications as Prime Aid being the equivalent of a mail order pharmacy.

126.    Defendants' motivation to eliminate Prime Aid as a competitor in the State of New Jersey is easily identified.  By eliminating Prime Aid as a source of medications for specialty patients residing in New Jersey, Humana and HPS are able to direct insureds, including insureds of Humana Health and Humana Insurance to Humana Pharmacy.

127.    The language and directives of New Jersey's Any Willing Provider laws are clear; Defendants' actions violate those laws.

## VIII.   ADDITIONAL ALLEGATIONS REGARDING HUMANA'S MONOPOLIZATION

128.    Humana has engaged in and orchestrated a sham exercise, denying due process and refusing to allow Prime Aid, a willing provider, access to the Humana Network on pretextual grounds.  Access to that Network is essential to Prime Aid's ability to continue to compete in the relevant market with Humana' captive specialty pharmacy, and is essential to preserving competition in that market.  In the process, notwithstanding New Jersey's Any Willing Provider

laws, Humana and its subsidiaries are denying patients and doctors the provision of superior

services which they have repeatedly chosen over Humana's specialty pharmacy in the

marketplace when allowed a choice.

129.    Humana and HPS, in collaboration with Humana Health and Humana Insurance,

recognizing an extraordinary opportunity to extract monopoly profits from specialty pharmacy

services in New Jersey where there is only one effective local state wide service provider in

Prime Aid, acted with specific intent to monopolize the market for specialty pharmacy services

for New Jersey residents locked into the Humana Network.  To the extent that Humana through

its captive specialty pharmacy does not already hold a monopoly, there is a dangerous

probability that it will obtain one through the elimination of competition from the key local

service provider and any others that may seek to take its place.  No other provider provides the

statewide coverage and level of service and support provided by Prime Aid.  By excluding Prime

Aid and relegating New Jersey residents to Humana's mail order pharmacy, Humana has

effectively eliminated competition on level of service and quality of service in the relevant

market, restricting output and extracting supra-competitive monopoly rents for lower service and

with reduced output.

130.    On information and belief, Humana and its subsidiaries including Defendant HPS

have entered into agreements with health insurers and others through which they have obtained

exclusive rights to determine what specialty pharmacies may provide services to the millions of

patients who are locked into use of Humana's PBM services, housed in or accounted to HPS.

These agreements, as applied by Humana and HPS, illegally and unreasonably restrain trade,

deprive patients and doctors of meaningful choices, superior service, and eliminate and foreclose

competition from independent specialty pharmacies with the size and ability to meaningfully

30

compete with specialty pharmacies affiliated with PBMs by offering superior services to patients and doctors.

131.    Through exclusion of key local service competitors like Prime Aid, Humana and HPS are able to exclude competition, restrict output and increase prices and lower service levels in the relevant market for specialty pharmacy services for New Jersey residents locked in to the Humana Network.  Patients who are insured in plans subjected to Humana's PBM Network are locked into using specialty pharmacies approved by Humana and HPS.  On information and belief, prior to its termination, Prime Aid was servicing a substantial percentage of the specialty drug prescriptions for New Jersey residents in the Humana Network.  Humana and HPS, in collaboration with the other Defendants, have acted with a specific intent to monopolize this market and their continued conduct such as that deployed against Prime Aid has a reasonable probability of succeeding in establishing a monopoly, to the extent they have not already obtained a monopoly through their wrongful exclusionary conduct.

132.    Humana and HPS' wrongful conduct excludes Humana's most effective competition from major independent specialty pharmacies like Prime Aid.  Defendants deny independent firms access to a locked-in patient specialty pharmacy market, harming competition and consumer welfare.

133.    The monopolistic conduct relating to specialty pharmacy services and drugs and PBM services as alleged in this Complaint are in the regular, continuous and substantial flow of intrastate commerce within the State of New Jersey and interstate commerce in the United States. They have a direct, substantial, and reasonably foreseeable effect and impact on such intrastate and interstate commerce.

A. **Relevant Market:  Market for Specialty Pharmacy Services for New Jersey Residents Locked In to the Humana Network**

134.    A relevant market in which Prime Aid competes with Humana, has competed with Humana, and/or would compete with Humana but for the unlawful exclusionary conduct of Humana, is the market for specialty pharmacy services to New Jersey insureds who are locked in to the Humana Network.

135.    Patients in health plans for which Humana's HPS serves as the PBM are locked into the use of only specialty pharmacies in the Humana Network to dispense specialty drugs and provide specialty pharmacy services.

136.    In recognition of the fact that patients are locked into their PBM networks and of importance to the patient's right to choose its pharmacy and the right of pharmacies independent of PBMs to continue to serve patients, many states, including New Jersey, have enacted Any Willing Provider Laws, which require PBMs to admit pharmacies to their networks.

137.    Although PBMs, such as Humana and its HPS, have used various tactics to force specialty drugs into mail order delivery by their own pharmacies and away from independent pharmacies, many doctors and patients prefer the personal service and care provided by a local specialty pharmacy.  Health plans and plan sponsors also seek health care service providers that can provide services in the local geographic area in which plan participants reside and work. Pharmacies, including specialty pharmacies, are subject to regulation by state law, and those providing specialty pharmacy services in New Jersey must comply with the laws of New Jersey. The relevant geographic market for specialty pharmacy services is the State of New Jersey.

138.    Nowhere is the importance of local provider access to PBM networks more important than with respect to specialty drugs.  Because of the severity of conditions treated by specialty drugs and the high expense of the drugs, patients requiring specialty drugs cannot

simply choose to go out of network and pay for the drugs themselves.  Further, hands-on, local services are particularly important to patients who need specialty pharmaceuticals.

139.    The monopolistic conduct at issue has had a direct and substantial adverse effect on competition and consumer welfare, in the market for specialty pharmacy services to patients in New Jersey locked in to the Humana Network.  The result is a diminution in the level of service and quality of care in specialty pharmacy services.  Those services are substantially below those that would prevail in a competitive market in which physician and patient choices were given due consideration, and Humana has restricted output in the provision and level of services in a manner that allows it to continue to extract supra-competitive prices for sub-competitive services.

<b><u>1.      New Jersey Patients Assigned to the Humana PBM Are Locked In to the Use of Only Specialty Pharmacies in the Humana Network</u></b>

140.    Patients in health plans for which Humana serves as the PBM are locked into the use of only specialty pharmacies in the Humana Network to dispense specialty drugs and provide related services.

<b>a.      As the Exclusive PBM, Humana Limits Specialty Pharmacies in its Network</b>

141.    Once a New Jersey resident signs up for a health plan, the health plan is almost always tied to an exclusive PBM.  The PBM controls what specialty pharmacies are in the network.

142.    Humana serves as the **exclusive** PBM for certain health plans in New Jersey, and it determines what specialty pharmacies are allowed in the network.

33

b.    **There Are a Very Limited Number of Specialty Pharmacies in New Jersey**

143.    There are a very limited number of specialty pharmacies available in New Jersey, and not all are available on all plans, impeding choice by patients requiring specialty medications.

144.    By way of example, although Prime Aid considered itself to be the leading specialty pharmacy in New Jersey, it is not available in all PBM networks.  It has recently been ousted from several networks, including Humana.

145.    On information and belief, with Humana's elimination of Prime Aid as a competing specialty pharmacy in the Humana Network in New Jersey, Humana's mail order specialty pharmacy then controlled a dominant share of the New Jersey specialty pharmacy business in its network.

c.    **High Switching Costs**

146.    Specialty patients suffer from severely compromised health, requiring uninterrupted injections and regimens for incredibly expensive and volatile medications, all of which precludes switching.

147.    Specialty patients, like others, have a limited opportunity to change health plans over a short time window, once a year.  For specialty patients, however, the needs are urgent, and a one-year window is useless.  In addition, practical realities addressed below preclude switching even then for specialty patients.

148.    Unlike ordinary prescription medications obtained from a retail pharmacy, a patient requiring specialty medications cannot simply choose to go out of network in light of the huge expense of specialty medications.  For example, the cost of Harvoni is $94,500, and Sovaldi is $84,000.

34

149.    Typically, an employee's choice of health plans is limited to choices made available by the employee's employer.

150.    By way of example, employees of the State of New Jersey and school employees in New Jersey participate in the State Employees Health Benefits Program and the School Employees' Health Benefits Program which have Express Scripts as their exclusive PBM. The employees have no choice of PBM.

151.    Not only are there limited opportunities to switch plans.  Even for those who might think of attempting to switch plans, the costs are prohibitively high.

152.    The onset or diagnosis of conditions requiring specialty pharmaceuticals and specialty pharmacy services typically require prompt treatment, and expensive treatment beyond the economic means of many of the patients absent access to health insurance coverage.

153.    Unlike normal prescriptions, it may take months to obtain clearance and coverage approval for specialty medications from the PBM, even after the physician prescribes specialty medication.

154.    Even where there is health insurance, many specialty patients also require financial assistance with co-payments, which can amount to thousands of dollars.  Co-pays for specialty medications present an insurmountable hurdle for many patients.  Moreover, any attempt to switch health plans may endanger their health from possible interruption in coverage and treatment on transfer, and put coverage approvals and co-pay assistance at risk.

155.    Once a patient having a health plan is diagnosed with a condition requiring specialty medications, his or her health is usually severely and critically compromised.  It is not practical for these compromised patients to switch health care plans in the midst of treatment.

By way of example, these patients suffer from conditions such as Hepatitis C, HIV, rheumatoid arthritis and treatment relating to organ transplants.

156.    These patients are often under care of multiple physicians with various specialties, available under one health plan, but not under alternative health plans.  Any attempt to switch health plans may interrupt the continuity of care from specific physicians.

157.    Many severely compromised patients requiring specialty pharmacy services may be compromised in their health, strength, mental acuity, and in other ways, and do not view switching health plans and risking loss of continuity in care as a viable option.

158.    Comprehension and navigation of health plans is an increasing challenge to everyone.  Most people do not understand the limitations of health coverage until the need arises, and switching plans is difficult.  For specialty patients, an attempt to switch health plans upon diagnosis or mid-treatment is simply not a practical option.

159.    A patient on specialty medications is unlikely to attempt a switch of health plans, for fear of discontinuity in health care providers and for fear of interruption of specialty medication in any transfer of specialty pharmacies.  By way of example, it may take a specialty patient three months to get coverage approval and co-pays to obtain specialty medications.  That medically compromised patient has reason to fear another three month wait from any attempt to switch.  The possibility of a change in specialty pharmacy that may be required upon change of health plans presents a particularly difficult obstacle in New Jersey, where the choice is severely limited.   A switch to a mail order pharmacy often results in difficulty in continuity of receipt of medication.

2.      **The Market for PBM Services is Dissociated with Patients' Choice of
Specialty Pharmacy Service Providers**

160.     The market for PBM services is dissociated with patient choice of specialty

pharmacies.  Any competition among PBMs does not prevent anticompetitive conduct and

effects in the market for specialty pharmacy services for New Jersey residents locked in to the

Humana PBM Network.

161.     As recently reported in *The Hidden Monopolies that Raise Drug Prices:  How

Pharmacy Benefit Managers Morphed from Processors to Predators*, Exhibit "A", at page 10,

"Specialty pharmacies report being frozen out by Express Scripts and other PBMs, with

customers granted access only to [the PBM's] in-house specialty provider . . . ."

162.     In New Jersey, however, Humana, Humana Health, Humana Insurance, and HPS

cannot limit customers' access to Humana's in-house mail order specialty pharmacy.  Although

HMO's, health insurers and their agents and affiliates may limit physicians and hospitals in the

network, pharmacies are different.

163.     In recognition of the disconnect between choice of health plan and choice of

pharmacy, the New Jersey Any Willing Provider Law prohibits them from limiting pharmacies

and pharmacists.  And it further prohibits requiring patients to use mail order pharmacies.

164.     The New Jersey Any Willing Provider Law recognizes the dissociation between

choices of health plans and PBMs and the patient's state-mandated separate choice of pharmacy

and pharmacist.

165.     Consumers do not chose PBMs, employers or health plans do.

166.     Consumers do not have unlimited choices for health plans.  They are limited by

employer choices.  Patients requiring specialty pharmacy services are further limited by high

switching cost and high information costs in selection of health pans.

37

a.  **Unilateral Changes Implemented by Humana to Locked-In Specialty Pharmacy Patients in New Jersey**

167.    Prime Aid operated successfully in the Humana network prior to Humana's trumped-up charges and sham termination in 2014.  In 2013 Humana's in-house mail order specialty pharmacy received URAC accreditation as a specialty pharmacy.  Anticipating a substantial increase in specialty pharmacy prescriptions with the introduction of new Hepatitis-C medications in late 2013 and 2014, Humana made a strategic decision to eliminate competition from its key local specialty pharmacy competitor in New Jersey, so that it could exploit locked-in consumers needing specialty pharmacy services.

168.    Prime Aid operated successfully for years in the Humana Network.  That changed when Prime Aid became the key New Jersey competitor for Humana's in-house specialty pharmacy.

169.    Prime Aid anticipated increases in specialty medications in advance of major medications for Hepatitis-C and other conditions in late 2013.  It spent years before that obtaining accreditations required to operate a specialty pharmacy and investing heavily in hiring staff and developing expertise and systems to meet the needs of specialty pharmacy patients in New Jersey.

170.    With the release of Hepatitis-C drugs in 2013, Prime Aid immediately became the principal competitor in the Humana Network in New Jersey for Humana's newly accredited in-house mail order specialty pharmacy.

171.    As release of major specialty medications approached, Prime Aid developed strong working relationships with physicians, clinics and hospitals, establishing a reputation for achieving good results with patients difficult to manage.

172.    Prime Aid employed people speaking multiple languages to enable communication with those who principally spoke Spanish, Russian, Vietnamese, Chinese dialects and other languages, who would otherwise be lost in the system, because of the detailed level of communication and follow up needed for patients to obtain and administer specialty medication.

173.    When the Humana PBM delayed or refused coverage, Prime Aid assisted patient appeals of denials to obtain coverage where warranted.

174.    Obtaining coverage, however, is useless, unless the patient can afford thousands of dollars of co-pays for specialty medications.  Many patients cannot.  Prime Aid established procedures and dedicated staff to follow up with patients who could not afford co-pays.  It worked hard for the patients to obtain exemptions or funding from governmental or private charitable sources or from the manufacture.

175.    With its relationships among physicians, clinics and hospitals, and its superior service, Prime Aid became the key competitor in New Jersey for Humana's affiliated mail order specialty pharmacy which obtained URAC accreditation in November 2013.  Prime Aid filled a significant percentage of the specialty pharmacy prescriptions in New Jersey in the Humana Network, and on information and belief, significantly more than any other local non-mail order specialty pharmacy.

176.    PBMs like Humana and HPS view affiliated mail order pharmacies as a huge profit center, accounting for a very significant percentage of the organization's profits.  Those profits are obtained not only by reimbursement rates for the specialty pharmacy, but also through significant rebates from manufacturers.  PBMs like Humana with in-house specialty pharmacies

often steer patients to medications that are the most profitable for the PBM based on available rebate deals, rather than physician prescriptions.

177.     Only a small percentage of all prescriptions filled are for specialty medications. However, because of the cost and utility of specialty medications, the dollar volume of specialty medications is approaching half of the overall expenses for prescriptions in the United States.  It is for this reason that Humana seeks to exclude its key competitor in New Jersey and obtain a monopoly over the business of locked-in consumers.

178.     Humana sought to drive specialty pharmacy patients to its newly-accredited mail order specialty pharmacy, and eliminated the competition provided by Prime Aid.  So Humana decided to eliminate the competition and take the specialty pharmacy patients Prime Aid had worked so hard to obtain and service.

179.     Humana terminated Prime Aid from its network on pretext.  Prime Aid was terminated to eliminate Humana's principal competition in New Jersey for Humana's in-house specialty pharmacy.

> **b.     Humana's Exploitation of Locked-In Insureds Needing Specialty Pharmacy Services**

180.     Virtually all of the Prime Aid specialty pharmacy patients in the Humana Network were transferred to Humana's in-house mail order pharmacy on Humana's wrongful termination of Prime Aid.  On information and belief, these patients were given no choice.

181.     The patients suffered from many problems in transferring medications to the mail order pharmacy.  Frustrated with the lack of service and responsiveness, many turned back to Prime Aid, which did its best to assist in the transfers.

182.     After termination of Prime Aid, and elimination of the key competitor in New Jersey for Humana's in-house specialty pharmacy, Humana's specialty pharmacy controls a

dominant share of the specialty pharmacy business for New Jersey patients locked in to the Humana PBM.

183.    The result is Humana extracting supracompetitive prices, through rebates and otherwise for measurably inferior service and reduced output, as patients that received the benefits of Prime Aid's efforts on their behalf were left with a mail order specialty pharmacy undisciplined by competition.

184.    The PBM industry is rife with conflicts of interest and kickbacks.  As explained in *The Hidden Monopolies that Raise Drug Prices:  How Pharmacy Benefit Managers Morphed from Processors to Predators*, Exhibit "A", at page 5, "there are indications that PBMs place drugs on their formularies based on how high a rebate they obtain, rather than the lowest cost or what is most effective for the patient."  As further explained, rebate incentives allow manufactures to raise price imposing further costs on consumers:  "Even if the rebates offset the list price, they are used to determine patient co-pays, so the consumer feels the burden from an increase in price that might otherwise never have taken place."

185.    In contrast to the high level of service and dedication to the patient and physician that were hallmarks of the highly competitive services provided by Prime Aid, upon elimination of competition from Prime Aid, Humana exploited the captive monopoly of locked in specialty pharmacy patients.

186.    In contrast to the superior services provided by Prime Aid, Centers for Medicare and Medicaid Services ("CMS") audits of the services provided by Humana in 2015 revealed the shamefully poor service one might expect from a monopolist undisciplined by the competition it has eliminated.  CMS determined to impose a civil penalty in the amount of $3,100,900 for Humana's failures and compromise of patient service.

187.    By way of example, the CMS audit found that Humana failed to comply with Medicare requirements related to formulary and benefit administration and coverage determinations, appeals, and grievances.  The audit found that Humana's "failures in these areas were systemic and resulted in enrollees experiencing inappropriate delays or denials in receiving covered benefits and may have increased out-of-pocket costs."

188.    At least as to specialty pharmacy services in New Jersey, Prime Aid had been a competitive gadfly, helping consumers navigate through the very obstacles the CMS found in its audits.  On elimination of the gadfly, consumers are left with inappropriate delays or denials in receiving covered benefits.  For specialty patients, such delays and denials can mean the difference between life and death.

189.    The CMS audit also suggests that Humana's misconduct has led or at least may have led to increased out-of-pocket costs.  By eliminating its principal competitor for specialty pharmacy services in New Jersey and taking its patients, Humana has entrenched practices and profit incentives that have increased effective prices to consumers of specialty medications and specialty pharmacy services to supracompetitive levels.  By eliminating its principal competitor, Humana was able to extract monopoly profits through rebates, by limiting expenditures on patients in plans it operates and boosting out-of-pocket expenses for consumers.

190.    Some of the practices CMS found in its audit that resulted in inappropriate denials of coverage included:

a.   Applying unapproved quantity limits; and

b.   Applying unapproved prior authorization edits.

191.   As a result of each of these failures, the audit found that enrollees experienced inappropriate denials of coverage and were delayed access to drugs, never received the drugs, or incurred increased out-of-pocket costs in order to receive the drugs.

192.   The CMS audit also found violations of coverage determination, appeal, and grievance requirements that resulted in Humana's enrollees being delayed or denied access to medication, including:

    a.   Failure to notify enrollees, or their prescribers, of decisions within 72 hours of receipt of expedited redetermination requests;

    b.   Failure to demonstrate sufficient outreach to prescribers or enrollees to obtain additional information necessary to make appropriate clinical decisions (with likely inappropriate denials of coverage due to insufficient provider outreach);

    c.   Inappropriately classified redeterminations as coverage determinations, denying second-level review and appeal rights;

    d.   Misclassified coverage determination or appeal requests as grievances and/or customer service inquiries, likely resulting in delays in receiving a coverage decision or the inability to appeal adverse decisions;

    e.   Failure to notify enrollees of decisions within 14 days of receipt of standard pre-service organization determination requests.

193.   The contrast is stark, severe and significant between the level of services and commitment to the patient and physician provided by Prime Aid, and the begrudging mail order services, to the extent not delayed, denied or at increased cost to the patient through out-of-pocket costs and manipulation of the PBM and affiliated specialty pharmacy.  Without Prime Aid in the Network, patients are steered to and controlled by Humana's in-house mail order

43

pharmacy.  They both pay more than they would in a competitive market and receive significantly lower levels of service, and increased delays and denials of coverage.

194.    By eliminating Prime Aid, Humana eliminated its key competitor for specialty pharmacy services in New Jersey.  Prime Aid expanded services, excelling in managing patients through the slow and difficult approval process, appealing denials, engaging in outreach to physicians to assist in obtaining coverage and co-pay assistance and ensuring compliance with treatment regimens.  After elimination of Prime Aid, patients are steered to the Humana mail order specialty pharmacy where they fall victim to the conduct and practices found by CMS that impede their timely access to critically needed medications.

### c.    High Switching Costs and High Information Costs

195.    Not only are there high switching costs that prevent New Jersey patients needing specialty pharmacy services from switch health plans or PBMs to obtain access to their choice of specialty pharmacy provider as addressed above, there are also high information costs that prevent New Jersey residents from shopping for health plans based on specialty pharmacy providers.

196.    The PBM industry has made billions of dollars by exploiting high barriers and costs of obtaining information on the services PBMs provide and the costs of those services. Information on the costs of specialty pharmacy services are even more difficult to obtain.

197.    In answer to the question "Why haven't PBMs fulfilled their promise as a cost inhibitor?," the article *The Hidden Monopolies that Raise Drug Prices:  How Pharmacy Benefit Managers Morphed from Processors to Predators*, Exhibit "A", page 4, explains that lack of access to information is a key factor:  "The biggest reason experts cite is an information advantage in the complex pharmaceutical supply chain."  For example, the CEO of EpiPen, asked to explain to Congress how much the PBM receives out of the severely increased price for

44

the EpiPen products confessed that she did not know the breakdown, to which a Congressman who asked the question responded, "Nor do I and I'm the pharmacist. … That the problem, nobody knows."  Exhibit "A", page 4.

198.     Typically, employers select health plan options available to their employees. Employees have limited options.

199.     The employer may select the PBM, but in most cases the health plan does.  In some cases, such as New Jersey State Employees and School Employees, only one PBM is available to all employees.

200.     Typically, a health plan will have an exclusive PBM, which determines the formulary of drugs available, and the pharmacies that participate in the network.

201.     Formularies change over the course of any year, as do participating pharmacies, all of which makes it unrealistic for consumers to attempt to choose a health plan based on available specialty pharmacies.

202.     In addition, the typical consumer does not even know the difference between a retail pharmacy, which provides most prescription medicines, and a specialty pharmacy, which provides specialty medications and related services.

203.     Even if a consumer may be able to check whether his or her primary care physician is available under a particular health plan, the consumer may assume that pharmacy services will be available, particularly in light of the Any Willing Provider statute for pharmacists and pharmacies in New Jersey.  Even if they are able to check for availability of a retail pharmacy, they would typically not even know to check for available specialty pharmacies, even if that information were available.  They cannot affirmatively choose what they do not understand.

204.    Further adding to high information costs, it is difficult for a consumer to track what specialty pharmacies are available in what plans.  Up to date and transparent information on specialty pharmacies available is not easy to find on all plans.

205.    Consumer choice of pharmacies and pharmacists in New Jersey is significantly different from their choice of physicians.

206.    In recognition of the fact that patients are locked into their health plan and PBM networks and of the importance of the patient's right to choose its pharmacy and the right of pharmacies independent of PBM's to continue to serve patients, many states, including New Jersey, have enacted Any Willing Provider Laws, which require patient choice and willing pharmacy access.

207.    The laws of New Jersey allow health plans to limit what physicians participate in their networks.  For example, organizations such as health maintenance organizations limit physicians in the network.  So do managed care plans.  However, the New Jersey Any Willing Provider Laws prohibit even an HMO and a managed care plan from excluding willing pharmacists and pharmacies from its network.

208.    New Jersey's Any Willing Provider Law, which does not cover physicians, but rather covers pharmacies and pharmacists, recognizes and addresses the disconnect between a consumer's choice of health plan and the consumer's choice of pharmacy and pharmacist.

209.    The health plan cannot prevent the consumer from choosing its pharmacy and pharmacist, and cannot exclude pharmacies willing to comply with terms.

210.    The health plan is also specifically precluded from forcing consumers to accept mail order pharmacy services.

211.    The policy behind the Any Willing Provider Law includes a recognition that these limits are required because consumers are simply not in a position to protect themselves from employers, health plans and PBM's, who are willing to limit their choices of pharmacists and pharmacies.

212.    The Any Willing Provider Law, regardless whether or not it is interpreted to create private causes of action, cements the dissociation between: (a) PBM's chosen by health plans chosen by employers; and (b) the consumer's choice of pharmacy and pharmacist and the pharmacy's rights to access to its patients.

213.    The Any Willing Provider Law preserves competition and consumer choice among pharmacies within a health plan.  And it ensures that the consumer cannot be forced to accept mail order pharmacy service.

214.     Consumers may not know their future diagnosis, or their future need for specialty pharmaceuticals when they shop for available health coverage.

215.    Even if patients are aware of their diagnosis, they are not in a position to shop for specialty pharmacies in selection of health plans.  Patients most in need of specialty pharmaceuticals are not sophisticated, and may have severely compromised health.

      **d.     Humana's Dominant Share of the Market for Specialty Pharmacy Services for New Jersey Patients Locked In to the Humana PBM**

216.     Following the elimination of competition from Prime Aid, Humana has a dominant share of the market for specialty pharmacy services for New Jersey residents locked in to the Humana PBM.

217.    Prior to the elimination of competition from Prime Aid, Prime Aid filled a substantial and increasing share of specialty pharmacy services for New Jersey residents locked in to the Humana PBM.  Immediately prior to its termination, Prime Aid was preparing to fill

millions of dollars a month of specialty prescriptions.  Prime Aid had spent years preparing for

the introduction of new Hepatitis-C medications, building staff and systems, obtaining

accreditations, and building relationships with physicians, clinics and hospitals.  Once those

drugs were released in late 2013, Prime Aid quickly ramped up a very significant volume of

business.  Because of its efforts, its relationships and its local presence in New Jersey, hundreds

of special patients in the Humana PBM filled specialty prescriptions through Prime Aid,

comprising a significant percentage of specialty pharmacy prescriptions filling in New Jersey in

the Humana Network.

218.    Specific data on the percentage of specialty pharmacy prescriptions filling in

New Jersey in the Humana Network filled by Humana's in-house mail order pharmacy, Prime

Aid and others is in the exclusive control of Humana.

219.    On information and belief, prior to its termination, Prime Aid filled a substantial

percentage of specialty prescriptions in New Jersey in the Humana Network, and substantially

more than any other local specialty pharmacy.  Upon elimination of competition from Prime Aid,

Humana steered Prime Aid's patients to its in-house pharmacy, giving Humana a dominant share

of specialty pharmacy business for New Jersey patients locked in to the Humana PBM.  Upon

information and belief that share exceeds 65 percent, but specific information is in the control of

Humana.

### e.    Supracompetitve Pricing for Subcompetitive Service

220.    The dissociation between the market for PBMs and the market for specialty

pharmacy services for patients locked in to the Humana Network is reflected in supracompetive

price for subcomeptitive services, which is addressed in part above at paragraphs 167 to 194 and

further below at paragraphs 221 to 277, all of which are incorporated by reference.

**B.    Market or Monopoly Power: Humana Has the Power to Exclude Competition and Control Prices and Has Exercised that Power**

221.    Humana holds market power or monopoly power in the market for specialty pharmacy services for patients locked into the Humana Network in New Jersey.  It has the power to exclude competition and has exercised that power by sham termination and exclusion of successful specialty pharmacy providers like Prime Aid.  It has used its power to exclude competition to increase its market share and its market power by terminating and/or excluding successful specialty pharmacy providers from its network and driving patients to its captive or affiliated specialty pharmacies.  HPS, Humana Health and Humana Insurance all collaborated and participated in this activity, assisting in achieving Humana's goal to drive monopoly profits through its captive specialty pharmacy by the conduct alleged throughout this Complaint.

222.    Prime Aid is unique in New Jersey.  It is a local service provider that has built its business by providing superior local service at the prices Humana sets for all providers in its Network.  Not only is it unique in competing on the level of service, but it is also unique in protecting the rights of the patient to services that would otherwise be denied by Humana in its effort to deny claims and reduce loss costs in its PBM and its health plans.  The Humana PBM has routinely denied patient claims, which ultimately Prime Aid has been successful in appealing and overturning for the benefit of the patient.  When underprivileged patients are unable to pay expensive co-pays, Prime Aid goes to extraordinary efforts to work with physicians, foundations and manufacturers to help the patient secure appropriate funding to be able to afford the mediations prescribed by their physicians.  Many patients that could have been served by Prime Aid will not be forced to use mail order by its exclusion, but rather will have claims denied or be unable to find appropriate funding for co-pays or deductibles and will be denied medication, enhancing Humana profits by reducing output in the specialty pharmacy market, while allowing

49

Humana to charge supra-competitive prices for the specialty pharmaceuticals supplied.  For many underserved patients, there will not only be no choice, but also no service.  Elimination of competition from Prime Aid facilitates Humana in restricting output and charging supra-competitive prices for inferior mail order services.  Both the Any Willing Provider Laws and the antitrust laws were intended to prevent such conduct.

223.    Data on the percentage of the relevant market for specialty pharmacy services for New Jersey residents locked in to Humana's PBM that Humana has driven into its captive specialty pharmacy is within the exclusive control of Humana.  However, on information and belief, including the lack of substantial independent specialty pharmacy providers other than Prime Aid in New Jersey, practices of forcing plan members to use the PBM-affiliated specialty pharmacy, exclusion of mail order pharmacies other than Humana's and the nature of Humana's business, Humana's captive pharmacy fills in excess of sixty-five percent of the specialty prescriptions for New Jersey residents locked into its Network – and with the elimination of Prime Aid from the Humana Network, the number could be significantly higher.  Humana has achieved such high percentages not by providing superior service but by refusing to observe the New Jersey Any Willing Provider Laws, which protect rights of pharmacies to access networks, allow patients to choose their pharmacy and prevent forcing patients to use mail order services.  Absent its wrongful exclusion from the Humana Network, Prime Aid would be filling many of those same specialty prescriptions for New Jersey residents locked into the Humana Network.  Humana has driven, or is in the process of driving, those same patients to its own captive pharmacies.  Humana has the ability and intent to continue to increase its market share through further sham terminations, refusals to deal, refusal to observe the requirements of the New Jersey Any Willing Provider laws, and other wrongful practices.

224.    Humana has used its power to exclude competition to create significant barriers to successful entry or expansion in the market for specialty pharmacy services for patients locked into the Humana Network in addition to significant barriers that already exist.  A regular practice in the industry which, on information and belief, Humana has employed, is to allow any out-of-network specialty pharmacy to fill the first order of a specialty drug, but then to require all future orders to be made through the PBM's specialty pharmacy, impeding entry into the market.  Once an independent pharmacy like Prime Aid garners a significant amount of specialty pharmacy business, it becomes a target for Humana.  Humana uses its power to terminate participation and drive the pharmacy's business to its own captive specialty pharmacy, thereby increasing its market power.

225.    Humana has also used the termination of Prime Aid as a powerful deterrent to expansion of any competing specialty pharmacy services in its Network in New Jersey.  Its termination of Prime Aid serves as notice to any independent specialty pharmacies that Humana will terminate them if they, like Prime Aid, present a competitive threat to Humana's extraction of supracompetitive prices from the market for locked in consumers.

226.    Further, it is not easy for a pharmacy like Prime Aid to establish the expertise, resources and accreditations necessary to become a significant local competitor for specialty pharmacy services in New Jersey.  It took Prime Aid several years and millions of dollars of investment to build its business to be able to provide superior local service.  Any others that might consider trying will be deterred by the barriers to achieving that level of competition and by the example that Humana has made of Prime Aid.

227.    The power of Humana to exclude, coupled with powerful incentives to drive lucrative specialty pharmacy business in its Network to its own captive specialty pharmacies,

51

create significant barriers to meaningful entry, expansion and penetration in the relevant market for specialty pharmacy services to patients locked-in to the Humana Network.  Specialty pharmacies, like Prime Aid, that have begun to have a positive impact on the market, are being smothered by wrongful terminations and exclusions, with PBMs like Humana disciplining independent specialty pharmacies and others who challenge their captive pharmacies by terminating them on sham grounds.

228.    In addition to the power to exclude competition, by operating the PBM, Humana has the power to set prices in the market for specialty pharmacy services for New Jersey patients locked in to its Network.  It has the power to set reimbursement rates for specialty pharmacies other than its own preferred pharmacy that discourage competition and to, maximize its profits as a monopolist by taking further profits itself on the back-end through rebates from the manufacturer based on volumes that independent specialty pharmacies could not meet, even if Humana allowed them to compete.  Because of its dominance of the market for specialty pharmacy services for New Jersey patients locked into its network, its ability to exclude competitors as the PBM, its ability to set reimbursement rates and discriminate in reimbursement rates for its own "preferred" providers, and its ability to obtain rebates based on volumes unachievable by smaller independent pharmacies, Humana has the power to set overall market prices in the market for specialty pharmacy services for New Jersey residents locked in to the Humana Network, and to manipulate pricing and output to maximize its profits as a monopolist.

229.    In addition, by exercising its power to steer patients, delay and deny coverage, ignore patients who cannot pay co-pays and other devices, Humana has the power to and has exercised the power to restrain output in the market for specialty pharmacy services for New Jersey patients locked in to the Humana PBM.

230.    When Prime Aid was in the market providing high levels of services and

expanding output, consumers were receiving a competitive level of service for a lower overall

price than Humana charges for a distinctly lower level of mail order service, for which Humana

is paid more.  Patients in the market now have a lower level of care on average, forced to endure

mail order service, delays and denials.  They have lost millions of dollars in access to co-pay

assistance that Prime Aid had worked hard to get for them, and would have worked hard to get

for patients in the market.  Many more patients in the market have had service delayed or denied,

consistent with the findings of the CMS audit and the experience of Prime Aid in its

extraordinary efforts to crack through the bureaucracy at Humana.  Humana has extracted

supracompetitive profits by imposing costs, delays and denials on consumers, and accumulating

rebates from manufacturers that are increased by its exercise of monopoly power.

### C.    Wrongful Conduct to Obtain or Maintain a Monopoly: Humana's Wrongful Exclusion of Its Key Local Competitor for Specialty Pharmacy Services for New Jersey Patients

231.    Humana's exclusion of Prime Aid has nothing to do with Prime Aid's

accommodation of requests of patients to ensure continuity of care by getting them their

medications when they travelled.  The proffered grounds were pretext and a sham.  Humana

excluded Prime Aid so that it could monopolize specialty pharmacy services for locked-in New

Jersey patients.

232.    Humana holds exclusive rights through its captive PBM HPS to millions of

patients who are members or subscribers to health plans which use the Humana PBM.  These

patients did not and cannot choose their own PBM -- they are locked into the PBM chosen by

their health plans.  Humana is abusing its power to exclude competition to eliminate its key

Network competitor for lucrative specialty pharmacy services in this State.  It is forcing doctors

and patients to forego their choice of Prime Aid as their specialty pharmacy and accept Humana's inferior captive mail order special pharmacy.

233.    This force-placed inferior service has no place in a competitive market, much less in one in which the PBM effectively acts as the fiduciary of the patient in securing appropriate services from providers over which the patient is supposed to have had the ultimate choice.

234.    Access to the Humana Network is essential to a specialty pharmacy's ability to compete in the relevant market for specialty pharmacy services to locked-in New Jersey insureds.  Despite Prime Aid's years of superior performance in its Network, Humana and HPS have acted without due process in excluding Prime Aid from participation in the Network based on false and pretextual reasons.

235.    Exclusion of a competitor from a market of locked in customers in and of itself is wrongful exclusionary or predatory conduct.

236.    Humana's exclusion of Prime Aid is not in good faith.  The exclusion does not relate to any legitimate performance problems or legitimate concerns in the service of patients or compliance with network requirements.

237.    Humana, HPS, Humana Health and Humana Insurance have acted arbitrarily and without due process in excluding Prime Aid solely to reduce competition for specialty pharmacy services while increasing Humana's profits, market share and market power in order to obtain a monopoly in the relevant market for specialty pharmacy services.

238.    Upon information and belief, Humana specifically intends to monopolize the market for specialty pharmacy services to New Jersey residents in its Network.   It does so with full knowledge that patients are locked into the Network, and unable to go elsewhere for expensive specialty drugs.  By excluding its most effective competitor, Prime Aid, and deploying

additional anticompetitive practices, Humana has a reasonable probability of succeeding in monopolizing the relevant market.

239.    On information and belief, Humana and its subsidiaries including HPS have numerous contracts with health insurers, health plans or self-insured employers that provide it with exclusive rights to determine what specialty pharmacies will be allowed to provide specialty pharmacy services to the patients who are insured by or participate in those respective plans. The agreements through which Humana and HPS obtain these exclusive rights are agreements in restraint of trade.  The cumulative effect of these agreements and Humana and HPS's exercise of exclusive rights under these contracts is to foreclose any effective competition in the market for specialty pharmacy services to New Jersey residents locked in to the Humana Network, and harm to competition and consumers in that relevant market and to Prime Aid.

240.    Humana, HPS, Humana Health and Humana Insurance have acted arbitrarily and without due process in terminating Prime Aid from its Network in order to monopolize the highly profitable market for specialty pharmacy services to New Jersey residents locked in to the Humana Network.  Humana's exclusive dealing contracts, coupled with its wrongful conduct, foreclose meaningful competition in the relevant market.

241.    Humana's wrongful conduct forecloses competition, harms competition and consumer welfare to harm Prime Aid, endangering the survival of its business, as well as its ability to serve the patients, clinics and doctors of New Jersey.

242.    Prime Aid had the foresight to build up its business, obtain accreditations, and build relationships with doctors, clinics and hospitals leading up to the release of new Hepatitis C medications in late 2013 and 2014.  Humana's in-house specialty pharmacy received URAC accreditation in November 2013, but its dominance of the Network Humana controlled was

55

threatened by Prime Aid with its huge success in providing superior local service to a whole new wave of specialty medication patients.

243.    Humana acted decisively and terminated Prime Aid based on bogus grounds.  The reason Humana terminated Prime Aid was to obtain domination of the market for specialty pharmacy services to New Jersey patients locked in to the Humana Network.  It has succeeded in doing just that, and harmed competition and reduced consumer choice in the process.

244.    As the PBM it had the power to exclude competition.  It set out to eliminate and take the business of its key competitor, and it succeeded.  By taking Prime Aid's significant share, Humana obtained a monopoly in a market for specialty pharmacy services for locked in consumers.  It has exercised that monopoly power to extract supracompetitive prices for sub competitive services.

**D.    Harm to Competition**

245.    Prime Aid is a high quality local specialty pharmacy that offers superior services to patients and prescribing physicians in the New Jersey area.

246.    Competition for health care services occurs on several dimensions.  Competition for level and quality of service is of particular importance in the dispensing of specialty drugs and the provision of specialty pharmacy services.  Prime Aid, with its local presence, and its history and continuing ability to provide extraordinary services to meet the needs of patients receiving and doctors prescribing specialty drugs in the New Jersey area is a superior specialty pharmacy.

**1.    Elimination of the Key Maverick Competitor Harms Competition**

247.    Prime Aid was not just another pharmacy.  It was Humana's key competitor for specialty pharmacy services for New Jersey residents locked in to the Humana Network.

248.    Prime Aid performed well in the Humana Network.  But when Humana received accreditation of its mail order specialty pharmacy in November 2013, it decided to cut off competition from its key competitor in New Jersey: Prime Aid.

249.    The findings of the CMS audit referenced above demonstrate the difficulties faced by consumers attempting to deal with the Humana PBM. Prime Aid was a maverick, independent specialty pharmacy competitor, pushing the PBM to do better for its patients in New Jersey that needed specialty medications.

250.    That was tolerable for Humana until the confluence of events in 2013.  First, new Hepatitis C medications were being released which would significantly increase the volume of specialty medications being prescribed.  Second, Prime Aid was perfectly positioned to take advantage of the increase in new prescriptions, having established its local specialty pharmacy business with superior services and key relationships with doctors, clinics and hospitals.  Third, Humana received accreditation of its own mail order specialty pharmacy, and sought to capture the increased specialty pharmacy business for itself, not by offering better services at a better price, but rather by bringing in its bully big brother, the Humana PBM, to eliminate its key competition:  Prime Aid.

251.    The elimination of a key competitor by a would-be monopolist always harm competition.  In this case, the harm has been severe.

252.    Having obtained a monopoly by its power to exclude competition and set prices, it has forced a distinctly lower level of service – mail order service – on the vast majority of locked in New Jersey patients requiring specialty pharmacy services.  It has done that in flagrant disregard of the New Jersey Any Willing Provider Law, which prevents forcing consumers to accept mail order services.

253.    It has denied locked in New Jersey residents access to the one local specialty pharmacy provider with the resources and ability to overcome the devices for delay, denials and increased costs deployed by the Humana PBM to limit plan expenses at the expense of consumers prescribed specialty medications by their physicians.  It retains its ability through rebates and its ability to set prices and exclude competition, coupled with its power and practices through the PBM to impose obstacles of delay, denials and cost (as found by CMS), to control output and set prices to maximize its profits as a monopolist, all to the harm of competition.

254.    Acting solely in the interest of its profits, Humana's illegal conduct has driven satisfied customers of Prime Aid and other patients locked in to its PBM into its captive mail order specialty pharmacy depriving the entire market of the principal local independent service provider and harming competition and the welfare of consumers.

255.    Prime Aid is by far, the largest of approximately five (5) independent specialty pharmacies in the state of New Jersey.  Doctors and clinics around the state regularly rely on Prime Aid to meet the unique needs of those requiring specialty drugs.  On information and belief, no local service provider other than Prima Aid is capable of providing the state-wide level of service or effective competition on superior local service.  By eliminating competition on local service and level and quality of service and excluding Prime Aid, with its extraordinary efforts to work with physicians and underprivileged patients to get medications to those who need them, Humana and HPS have restricted output in the relevant market and engaged in extraction of supra-competitive prices for sub-competitive levels of service.  They have effectively preempted and eliminated the competitive process altogether.

256.    When Prime Aid was part of the Humana Network in calendar year 2013, it filled millions of dollars in specialty prescriptions comprising a material portion of the specialty prescriptions in that Network.

257.    In the market for specialty pharmacy services to insureds in the Humana Network, Defendants' illegal exclusionary conduct has foreclosed Prime Aid entirely from the relevant market in which it competes with Humana.  Because Prime Aid served as Humana's most significant maverick competitor in New Jersey for specialty pharmacy services, competition and consumer welfare have been severely harmed by Humana's wrongful conduct eliminating its key competitor to obtain a monopoly.

### 2.    Supracompetitive Prices and Subcompetitive Services

258.    Eliminating the key competitor Prime Aid has allowed Humana to impose subcompetitive levels of service and supracompetitive prices in the captive specialty pharmacy market it has monopolized

259.    Following the elimination of competition from Prime Aid, the market suffers from much lower levels of service for specialty pharmacy services, where the local presence can make all the difference in results.

260.    By pushing the majority of New Jersey patients locked in to the Humana Network to mail order specialty pharmacy services, Humana has imposed on the captive market a level of services substantially and distinctly below that available when Prime Aid was in the market. Mail order is not sufficient to keep many of these compromised patients on complex regimens. Many patients need the local presence of a specialty pharmacy, including one like Prime Aid with competent professionals speaking different languages as needed to sheppard them through complex treatments, many of them must self-administer.  Mail order service is simply must less responsive to consumer needs and provides less needed continuity of personnel and services than

59

Prime Aid's local specialty pharmacy services.  Mail order does not deliver in bad weather, Prime Aid does, including through Hurricane Sandy.

261.    In addition, as established in the CMS audit, the locked in patients are confronted with delays, denials and increased costs imposed by Humana.  The substantial and effective resources of Prime Aid are no longer available to counteract these deliberate tactics (or, at a minimum, deficiencies) of the PBM and its affiliated mail order pharmacy.

262.    Following Prime Aid's termination, the sophistication and machinations of PBMs like Humana and their affiliated mail order specialty pharmacies in extracting monopoly profits from supracompetitive prices in the market has only increased.

263.    Instead of responding to competitive forces exerted by Prime Aid, Humana is now free to maximize its profits by restricting output and manipulating prices and the rebates it receives from manufacturers to charge more for the lower level of services than could be charged in a competitive market spurred by competition from Prime Aid.

264.    As explained in *The Hidden Monopolies that Raise Drug Prices:  How Pharmacy Benefit Managers Morphed from Processors to Predators*, Exhibit "A", page 4, "lack of transparency enables PBMs to enjoy multiple hidden revenue streams from every other player," and "[t]he PBM industry is rife with conflicts of interest and kickbacks."  The conflict of interest in a PBM wrongfully eliminating competition from the key local specialty pharmacy competing with its in-house mail order specialty pharmacy in New Jersey is obvious.   Patients in dire need of specialty medications are forced to endure the types of delays, denials and costs identified by CMS in its audit and profiteering related in Exhibit "A" and noted in this Complaint.  Rather than an independent advocate to navigate the delays, denials and costs that the Humana PBM places in the way of consumers, the vast majority of locked in consumers are now relegated not

just to inferior mail order service, but to a mail order pharmacy owned and operated by the same company that owns the PBM interposing delays, denials, and costs, reducing output and extracting monopoly rents at their expense.

265.   In the captive market today, locked in patients are paying supracompetitive prices for subcompetitive service, and Humana is realizing monopoly rents by restricting output and increasing effective prices and profits through rebates and manipulated pricing.

### 3.   Restriction of Output

266.    Humana has the power to restrict output in the market for specialty pharmacy services for New Jersey residents locked in to the Humana Network.  As discussed above, it deploys delays, denials and increased costs.  Unlike Prime Aid, which went to extraordinary lengths to assist patients in obtaining co-pay assistance, Humana's conflicting financial incentives as PBM and or as operator of health plans, leave it content to turn away patients who cannot afford co-pays, or leave them to their own devices to attempt to obtain assistance.

267.   As the PBM, Humana can and does limit participating specialty pharmacies to maintain its monopoly.  It can and does manipulate pricing through rebates it gets from manufacturers and preferred pricing for its own pharmacy.

268.   It can limit output, and has done so by eliminating Prime Aid from its Network, as well as through delays, denials of coverage and lack of co-pay assistance efforts.  Prime Aid's focus was to expand output by working proactively with physicians, clinics and patients to establish coverage in the face of delays and denials from the PBM, to help indigent or moderate income patients to obtain co-pay assistance, to break language barriers to bring complex medications to those who do not speak English.  As seen in the CMS audit, Humana interposes delays and denials to limit coverage and reduce output, allowing it to maximize profits and still extract monopoly profits from the locked in New Jersey residents needing specialty medications.

4.      **Elimination of Consumer Choice**

269.    A monopolist's elimination of choices available to consumers harms competition.

270.    Even if there may be some local specialty pharmacies other than Prime Aid in New Jersey, and even if any might be permitted to participate in the Humana Network as long as they pose no competitive threat to Humana's specialty pharmacy, consumers have been denied the choice of the one specialty pharmacy that had the resources and ability to deliver superior services. That denial occurred at a crucial time in the market, as new specialty drugs were coming on line. Just as Prime Aid was ramping up to assist patients needing new Hepatitis C medications, Humana stepped in and took its business, giving itself a monopoly for specialty pharmacy business of locked in New Jersey specialty pharmacy patients, and allowing it to perpetuate that monopoly.

E.      **Antitrust Injury**

271.    Prime Aid has been injured in its business and property by reason of Humana's anticompetitive conduct including its denial of patient and doctor choice of the quality local service of Prime Aid over lower quality mail order specialty pharmacy services forced on those patients and doctors by Humana's conduct and the anticompetitive restraints in contravention of the State of New Jersey's Any Willing Provider Law.

272.    By excluding Prime Aid from a market of locked in consumers needing specialty pharmacy services dissociated from any markets for PBM services, Humana has harmed competition, consumer welfare and Prime Aid, and Prime Aid has suffered antitrust injury.

273.    Humana, a monopolist, has circumvented patient choice and provider access to patients provided under state law, injuring competition, consumer welfare and Prime Aid.

274.     Consumer welfare, competition as a whole and Prime Aid are injured by Humana's elimination of competition of its key, maverick local competitor to take its share of the captive market and create a monopoly.

275.     Consumer welfare, competition and Prime Aid have been injured by Humana's wrongful conduct because captive patients have been forced to accept inferior mail order services from Humana and Prime Aid has been denied the right to offer them superior services at lower cost, and has wrongfully been forced to transfer its hard-earned customers to Humana's mail order pharmacy facilitating Humana's establishment of a monopoly through wrongful conduct.

276.     Consumer welfare, competition and Prime Aid have been injured by Humana's wrongful conduct in eliminating competition from the one competing specialty pharmacy in New Jersey with the demonstrated resources and abilities to counteract Humana's anticompetitive delays, denials and increased costs of coverage for specialty pharmacy patients locked in to the Humana Network.

277.     Competition, consumer welfare and Prime Aid have been injured by Humana's wrongful monopolization of the market for specialty pharmacy services for New Jersey residents locked in to the Humana Network.

### FIRST CAUSE OF ACTION:
### DECLARATORY RELIEF (PRESERVED FOR APPEAL)[1]

278.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

--------------------------------

[1] On March 2, 2017, the Court dismissed Counts One and Two with prejudice.  These Count are included in the Second Amended for the avoidance of doubt that Plaintiff preserves rights to appeal their dismissal.

279.     An actual controversy has arisen and now exists between Prime Aid and

Defendants as to Prime Aid's right to participate in the Humana Network.

280.     Prime Aid has completely and exhaustively refuted all grounds which Defendants

have cited as bases for their decision to reject Prime Aid's application to join Humana's

Network.

281.     At all times, Prime Aid has remained ready, willing and able to satisfy

Defendants' terms and conditions for its Network pharmacies.

282.     New Jersey's Any Willing Provider Statute requires recognition of the right of

pharmacies, like Prime Aid, who are willing to meet the terms and conditions established for

participation in a health plan to participate in the network.

283.     Prime Aid has suffered, and will continue to suffer, damages, including

irreparable harm, monetary damages, attorneys' fees, and costs, as a result of the unlawful

rejection by Defendants of Prime Aid's application to join Humana's Network.

**SECOND CAUSE OF ACTION:**
**INJUNCTIVE RELIEF (PRESERVED FOR APPEAL)[2]**

284.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

285.     The rejection by Defendants of Prime Aid's application to join the Humana

Network has caused and will continue to cause irreparable harm to Prime Aid.  For every week

that Prime Aid is not a member of the Humana Network, Prime Aid has lost millions of dollars

in revenue.  Those revenues make up a large portion of Prime Aid's total revenue, and as an

independent pharmacy, Prime Aid's viability and existence is threatened by the illegal rejection

of Prime Aid's application.

---

[2] See footnote 1, on page 63 above.

286.     Should Defendants be permitted to continue in their illegal termination and rejection of Prime Aid from the Humana Network and should Prime Aid be forced to close as a result of this illegal termination, no recovery of monetary damages at trial will be able to revive Prime Aid.

287.     In addition to threatening Prime Aid's viability, the termination and rejection of Prime Aid from the Humana Network threatens Defendants' specialty insureds who suffer from serious and chronic medical conditions.  The public interest, and the health and safety of New Jersey residents, is best served by injunctive relief against Defendants.  By enjoining Defendants from rejecting Prime Aid's applications, those patients will have greater access to vital health care and have greater choice among their health care providers, as New Jersey's Any Willing Provider statute clearly intended.

288.     Injunctive relief, which would allow Prime Aid to again serve Defendants' insureds, will cause no material harm to Defendants.  Instead, Defendants would continue reaping large profits, as they have for years.

289.     Prime Aid has at all times been and remains currently ready, willing and able to meet the terms and conditions that Defendants have set forth for their Network providers.  The refusal by Defendants to admit Prime Aid into its Network despite Prime Aid's willingness and ability to accept the terms and conditions HPS has set forth is in clear violation of New Jersey's Any Willing Provider statutes.

290.     Prime Aid requests that this Court enjoin Defendants from rejecting Prime Aid's application to join the Humana Network and other relief as set forth in the prayer for relief.

## THIRD CAUSE OF ACTION:
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT

291.   Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as though fully set forth herein.

292.   Humana has a high degree of market or monopoly power in the market for specialty pharmacy services to New Jersey insureds who are locked in to its Network, including the absolute power to exclude competition from that market.  It has wrongfully used its power to exclude competition from the market to increase that market power.

293.   Humana has wrongfully excluded its most significant local independent competitor, Prime Aid, from the relevant market contrary to the New Jersey Any Willing Provider laws and on sham pretext grounds.

294.   The wrongful conduct of Humana, HPS, Humana Health and Humana Insurance, including their exclusion of Prime Aid from the Network has been undertaken with a specific intent to monopolize the market for specialty pharmacy services to New Jersey insureds who are locked into to its Network.

295.   Humana has a reasonable probability of succeeding in monopolizing the market for specialty pharmacy services to New Jersey insureds who are locked into to its Network based on, *inter alia*, its absolute control of access to the market, its elimination of competition from major independent specialty pharmacies like Prime Aid, its control of prices in the market, its ability and actions to limit output in the market, barriers to entry or expansion of local specialty pharmacies, its ability to exclude all meaningful independent competition on level and quality of service, and its ability to direct lucrative specialty pharmacy business in the Network to its captive or affiliated mail order and specialty pharmacies.

296.    Humana's monopolization and attempted monopolization violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

297.    Humana has exercised market power to exclude Prime Aid from competing in the market in which Humana competes with Prime Aid through its captive and/or affiliated mail order and specialty pharmacies.

298.    Humana's exclusionary conduct, exercise of market power, monopolization and attempted monopolization have harmed competition and the welfare of consumers.  Prime Aid has been injured in its business and property by reason of these violations of the Sherman Act, suffering antitrust injury caused by the anticompetitive and wrongful conduct of Humana.

299.    Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Prime Aid is entitled to treble damages, injunctive relief and costs including attorneys' fees.

### FOURTH CAUSE OF ACTION:
### VIOLATION OF NEW JERSEY ANTITRUST ACT

300.    Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as though fully set forth herein.

301.    Humana has market power in the market for specialty pharmacy services to New Jersey insureds who are locked into to its Network, including the absolute power to exclude competition from that market.

302.    The wrongful conduct of Humana, HPS, Humana Health and Humana Insurance, including their exclusion of Prime Aid from the Network has been undertaken with a specific intent to monopolize the market for specialty pharmacy services to New Jersey insureds who are locked into to its Network.

303.    Humana has wrongfully excluded its most significant local competitor, Prime Aid, from the relevant market contrary to the New Jersey Any Willing Provider laws and on

sham pretext grounds.  Its exclusion of Prime Aid from the Network is intended to eliminate competition from Prime Aid in order to allow Humana to monopolize the market for specialty pharmacy services to New Jersey insureds who are locked in to its Network.

304.    Humana has a reasonable probability of succeeding in monopolizing the market for specialty pharmacy services to New Jersey insureds who are locked in to its Network.

305.    Humana's monopolization and attempted monopolization violates the New Jersey Antitrust Act, 1970 N.J. Laws ch. 73, codified at N.J. STAT. ANN. §§ 56:9-1 to -19.

306.    Humana has exercised market power to exclude Prime Aid from competing in the market in which Humana competes with Prime Aid through its captive specialty pharmacy.

307.    Humana and HPS's exclusionary conduct, exercise of market power, monopolization and attempted monopolization have harmed competition and the welfare of consumers and Prime Aid has been injured in its business and property by reason of these violations of the New Jersey Antitrust Act, suffering antitrust injury caused by the anticompetitive and wrongful conduct of Humana.

308.    Pursuant to the New Jersey Antitrust Act, Prime Aid is entitled to treble damages, injunctive relief and costs including attorneys' fees.

309.    WHEREFORE, Plaintiff prays for judgment as follows:

(a)    a declaration that Defendants are required to admit Plaintiff into the Humana Network in accordance with New Jersey's Any Willing Provider statutes;

(b)    an order enjoining Defendants from rejecting Plaintiff's application to join the Humana Network;

(c)    treble damages for injury to the business and property of Prime Aid caused by Defendants' violations of the Sherman Act and the New Jersey Antitrust Act;

(d)     all of the costs of this action including, but not limited to, reasonable

attorneys' fees; and

(e)     any further and additional relief as this Court may deem just and proper.

## JURY DEMAND

310.     Plaintiff hereby demands a jury trial.

DUANE MORRIS LLP

*/s/ Jonathan L. Swichar*
Jonathan L. Swichar (020721997)
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
Telephone:  973-424-2000
Fax:  973-424-2001

Michael M. Mustokoff (*pro hac vice*)
Edward G. Biester (*pro hac vice*)
Robyn S. Stoter (011582009)
30 S. 17th Street
Philadelphia, PA 19103
Telephone: 215-979-1000
Fax: 215-754-4548
MMustokoff@duanmorris.com
EGBiester@duanemorris.com
RSStoter@duanemorris.com

*Attorneys for Plaintiff Prime Aid Pharmacy Corp.*

Dated:  April 3, 2017

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 11.2</u>

I HEREBY CERTIFY that the matter in controversy is not the subject of any other action

pending in any other court or of any pending arbitration or administrative proceeding.

DUANE MORRIS LLP

*/s/ Jonathan L. Swichar*
Jonathan L. Swichar (020721997)
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429
Telephone:  973-424-2000
Fax:  973-424-2001

*Attorney for Plaintiff Prime Aid Pharmacy
Corp.*

Dated:  April 3, 2017